THE STATE OF NEBRASKA, EX REL. ROBERT D. SILVER, v. ALBERT G. KENDALL ET AL., BOARD OF PUBLIC LANDS AND BUILDINGS, AND W. H. B. STOUT.

1. **Mandamus:** WHAT ACTS MAY BE CONTROLLED BY. The only acts which courts can control by the writ of mandamus are such as are purely ministerial, and with which nothing like judgment or discretion is connected.

2. ———: BOARD OF PUBLIC LANDS AND BUILDINGS. In awarding the contract for the erection and completion of the main building of the new state capitol the board of public lands and buildings exercised their own judgment in matters respecting which they cannot be controlled by mandamus.

ORIGINAL application for mandamus.

*James W. Savage,* for the relator.

*Isaac Powers, Jr., Attorney General,* and *John C. Cowin,* for the respondents the Board of Public Lands and Buildings, and *Mason & Whedon, Burr & Kelly,* and *George E. Pritchett,* for respondent Stout.

LAKE, CH. J.

The relator, Robert D. Silver, was one of the two bidders for the contract for the erection of the main building of the new state capitol, and William H. B. Stout, one of the respondents, was the other, and the successful one; the contract having been formally awarded and let to him. The other respondents constitute the state board of public lands and buildings, to whom the duty of awarding and letting the contract belonged. This work, and the contract for doing it, were provided for in the act of the legislature entitled—"An act to provide," etc., "for the erection of the main building of the new capitol," etc., approved February 27th, 1883. (Laws, Ch. XCVI.) The relief sought by the relator is, to have said board required to cancel the contract entered into with Stout, and to make a new award upon the basis of his own bid. This we are unable to do, for the following reasons, stated as briefly as possible:

The relator seeks the relief prayed for on the ground that his bid conformed in every particular to the requirements of the statute, and was the best and the lowest, by the sum of forty-one thousand one hundred and eighty-seven dollars and twenty-five cents. If such were in fact the real character of his bid, as shown by the evidence, inasmuch as it was evidently contemplated by the legislature that such an one, if any, should be taken, we might pos-

sibly be able to grant the desired relief. But unfortu-
nately for the relator, and perhaps for the state, such was
not his bid in the estimation of the board, nor as shown by
the evidence here produced.

Referring to the reasons assigned by the board at the
time of making the award, for their action, we find the
following: "That the bid of said Silver is not in accord-
ance with the law, the advertisement heretofore adopted by
this board, in that the sample of stone, considered by the
board as the most essential sample of material to be fur-
nished, did not comply with subdivision three, page ten of
the specifications heretofore adopted, in that the stone so
presented as a sample, did not come 'from a quarry which
has been worked long enough to insure equal texture, qual-
ity, color, and sufficient quantity of the quality, texture,
and color' to complete the said main capitol building.
But that said sample of stone did come from some ledge of
rock unknown to this board, or to Mr. Silver, who offered
it as a sample. And the board do further consider that it
would be against public policy and the best interest of the
state, to award a contract for such an important building
to be built from stone from a ledge of rock, undeveloped,
and of which nothing is known," etc. "That the bid of
W. H. B. Stout was in accordance with the law, the adver-
tisement, and the specifications; that the sample of stone
furnished by him was from a quarry which had been devel-
oped for several years, and from which the stone used in the
construction of the east and west wings were furnished,
and that the said quarry appeared in condition to furnish
the necessary quantity and quality of stone desired," etc.

Without referring particularly to the evidence on the
subject, we will say that these findings of the board as to
the samples of stone exhibited by Silver and Stout respec-
tively, are fully sustained; indeed, they are practically
conceded to be true. In his testimony, Mr. Silver says:
"This sample of rock I got from Mr. G. A. C. Smith be-

fore bidding for the east wing of the state house, August,. 1881, I think.    This is the same sample I then furnished. I got several samples, and I think this is one of them.    I may be mistaken.    I know not from what quarry Mr.. Smith got the rock other than what he told me.    I do not. know of my own personal knowledge that it had been opened and worked.    *    *    *    I cannot swear whether it. came from a quarry, and was not a piece of loose rock.    * *    *    *    I did not then have a quarry from which I was. to furnish the stone.    *    *    *    *    I knew where I thought I could get the stone from.    Lansing & Yansen had a quarry from which I thought I could get the rock.    *    * *    *    I do not know when this quarry of Lansing & Yansen was opened.    *    *    *    I had no reason to believe· this piece of rock came from their quarry."    The sample exhibited by Stout came from his own quarry on the Platte· river, opposite the town of South Bend, which was fully developed.    Such being the basis of the action of the board, the question to be decided is simply, whether it supports the award, or, in othei words, whether, under the law governing their action, these findings respecting the samples of stone were material, and of a matter intrusted to their judgment and discretion ?

Looking to the act of the legislature before referred to we find that the first step required of the board in the con-- struction of this building was to select an architect, and adopt "plans and specifications," which they did under sec. 3 of said act.    This section was evidently framed in the interest of William H. Wilcox, the architect selected; the· board being directed, impliedly at least, to give him the job of furnishing the plans and specifications, if he would take it for the designated compensation, viz., "for a sum not to exceed three-fourths of one per cent of the contract price of the building," which he seems to have done.    The next step of the board was, under section 6, to advertise for· bids for the erection of the building, "and the completion.

of the same in accordance with the plans and specifications adopted." In the consideration of bids, and the award of the contract, they were specially directed by section 8 to " have due regard to the samples of materials furnished with the bids," and to see to it that the facings and trimmings of the building should " be of limestone, and of equal quality, and of same color, as near as practicable to that used in the east and west wings, now completed." And by section 10, the board were required to "reserve the right to reject any and all bids," which, "in their judgment," were "not in accordance with the law and the advertisement."

Thus it is seen that the decision of the board on the merits of the bids, in the matter of their compliance with the requirements of the specifications, was made a very material part of their duty. The specifications, when adopted, became, as it were, a part of the law for their guidance afterwards. The invitation for proposals, the bids, and the award of the contract were all required to be with special reference to the plans and specifications, and subject to them. Looking to the specifications, we find they provide in respect to the stone, *first,* that it must " *correspond exactly with the two wings now completed,"* and *second,* that " *no stone will be permitted to be used, unless it is taken from a quarry which has been worked long enough to insure equal texture, quality, color, and sufficient quantity of the quality, texture, and color to absolutely conform with that used in the east and west wings of the new capitol."*

It being conceded that, in this particular at least, Silver's bid was materially defective, it could not properly have been accepted. The specimen of stone which he submitted may have been fully equal in texture and durability to that produced by his competitor, but in every other of these requisites it was entirely deficient. Not only was it wanting in the particular on which the board placed their decision, but, as the testimony shows, in that of color also.

To any one at all acquainted with the meaning of language and the rules of construction of statutes, it must surely be evident from these brief references to the law and the specifications by which the board were governed, that in several particulars, and especially in the matter of whether the bids were "in accordance with the law, and the advertisement," the legislature intended to trust solely to their judgment. This being so, it is very clear that no court has the right, by the writ of mandamus, to interpose its judgment, to direct or influence their action. To do so would be usurpation. The only acts which courts can rightfully control by this writ are such as are purely ministerial, and with which nothing like judgment or discretion is connected. *United States v. Seaman,* 17 How., 225. *Same v. Guthrie,* Id., 378. *State, ex rel. Lewis, et al. v. Governor et al.,* 22 Wis., 110. *People v. The Contracting Board,* 27 N. Y., 378. Though they may require inferior tribunals to exercise judgment given them, or to proceed to the discharge of any of their functions, they "cannot control judicial discretion." Code of civil procedure, § 645.

Several other points were raised and discussed by counsel on the hearing, as tending to support the action of the board, but, as the one we have considered seems to have controlled the action of the board, and is conclusive in our estimation of the relator's rights under the law, we will not notice them. We desire it to be understood, that in denying the writ we place our decision squarely on the ground that, in awarding the contract to Stout and denying it to Silver, the board were required to and did exercise their own judgment in matters respecting which they cannot properly be controlled by mandamus.

WRIT DENIED.

COBB, J., concurs.

MAXWELL, J., dissenting.

I am unable to give my assent to the opinion of the majority of the court, for the following reasons: The bid of Mr. Silver is more than $41,000 less than that of Mr. Stout, and his proposition is to erect the building in *all respects in conformity to the plans and specifications and the law.* Mr. Stout can do no more than this, nor is it contended that he proposes to perform any more labor or expend any more money in the building than would Silver if the contract was awarded to him. Silver is a practical builder, trained to the business, and has erected a considerable number of public buildings in this and other states, among which are the state university and insane asylum, erected in 1871–2. He tendered a good and sufficient bond to enter into the contract and comply with its requirements. The ground upon which his bid was rejected was because he did not show that he possessed a developed stone quarry from which to obtain the ashlar for the building, and on the argument the further objection that his schedule did not include all the articles necessary to complete the building. These objections will be considered in their order.

The act for tearing down and removing the old capitol building and for the erection of the new, among other provisions, contains the following:

"Sec. 6. The board, within ten days after the adoption of plans and specifications, shall advertise for thirty days in three newspapers in the state of Nebraska, one in Chicago, Illinois, and one in St. Joseph, Missouri, for bids for the erecting of the main building of the said state house and the completion of the same in accordance with the plans and specifications adopted. The plans and specifications shall be kept on file in the office of the commissioner of public lands and buildings, and he is hereby made custodian, and it shall be his duty to see that they are carefully preserved, and they shall remain the property of the state.

"Sec. 7. The contract shall provide for the completion of the said main building by the first day of December, 1889.

"Sec. 8. The board of public lands and buildings in awarding said contract shall have due regard to the samples of materials furnished with the bids, and the facings of said building and the trimmings shall be of limestone, and of equal quality and same color as near as practicable to that used in the east and west wings, now completed.

"Sec. 9. The board shall require a good and sufficient guarantee to accompany each bid, to the effect, that should the contract be awarded to the bidder, he will within twenty days from the awarding of said contract with the state for the erection of said main building, according to the advertisement and his bid, and that he will further give a good bond running to the state of Nebraska, in the sum of three hundred thousand dollars, to be approved by the governor, the bond conditioned for the faithful performance of his contract, according to law and terms thereof.

"Sec. 10. The board shall reserve the right to reject any and all bids, if in their judgment they are too high, or not in accordance with the law and the advertisement; and in that event they shall proceed to advertise as before until there is a favorable bid received by the board. *Provided,* That said board shall reject all bids for said main building for which the bid or bids be for the sum of four hundred and fifty thousand dollars or upwards. *And it is hereby provided,* That said board shall not expend any sum exceeding said sum of four hundred and fifty thousand dollars in the erection and full completion of said main capitol building.

"Sec. 11. Immediately upon the awarding of the contract the board shall appoint a competent and practical builder as superintendent of construction, whose duty it shall be to see that the plans and specifications of said building are faithfully carried out in construction by said

contractor, and it is hereby made the special duty of the superintendent to see that the proper material is used in the construction of said building, and that all work is done in a skillful and workmanlike manner.

"Sec. 12.    It shall be the duty of the superintendent to make out and return to the board, monthly statements, showing the amount of work done on said main building, and materials furnished by the contractor, and perform such other services, and give such other information from time to time, as the board may require.    Such statements and information shall always be in writing and sworn to by the superintendent.

"Sec. 13.    The superintendent shall, before entering upon the discharge of his duty, enter into a good and sufficient bond to the state of Nebraska, in the sum of twenty-five thousand dollars, to be approved by the board, conditioned for the faithful performance of his duties as specified in this act.

"Sec. 14.    The superintendent shall be allowed such compensation as the board of public lands and buildings. shall decide, not to exceed two per cent on the contract price of said building, or of the work done on the same, under his supervision, which amount shall be certified by the board, and on such certificate the auditor of public accounts shall draw his warrant on the general fund of the state for said amounts, from time to time as the work progresses, not to exceed the rate of one thousand dollars per year for the actual time employed.

"Sec. 15.    During the progress of the construction of said building, the superintendent shall make out and file with the board, monthly estimates showing the amount of work done on said main building and material furnished by the contractor, together with such other information from time to time as the board may require him to give, and the board shall, after a careful examination of such estimate, if correct, certify the same to the auditor of public

accounts, showing the amounts thus found due the contractor, and upon such certificates being thus presented to the auditor, he shall draw his warrant upon the special fund created for the erection of said building, in favor of the contractor, for eighty-five per cent of the amount thus certified by the board, and when the contract is completed, and the final estimate made, the board shall certify this fact to the auditor of public accounts, who shall then draw his warrant as before, including in the said last warrant the fifteen per cent retained, making the balance due the contractor upon his contract."

The only samples of material furnished by either Stout or Silver consisted of small cubes of rock from near Louisville, in this state. No objection was made by the board to either the color or texture of the piece exhibited by Silver, nor was his bid rejected on that ground. The question then arises, had the board any authority to impose upon bidders the condition that to be successful they must own a developed quarry? It will be observed that they were required to advertise for bids in three newspapers in this state, one in Chicago, Illinois, and one in St. Joseph, Missouri, for bids for erecting the main building, and the completion of the same according to the plans and specifications.

The evident object of thus advertising was to invite proposals from builders. The legislature in effect provided that notice of the lettings should be given as wide a publicity as possible in order that the state might have the benefit of competition. In order to invite competition, bidders must not be burdened with onerous conditions which would have the effect to deter them from bidding, and might prevent all competition. Suppose it was made a condition that the person bidding should own a pine forest from which the pine lumber was to be manufactured that was used in the building, or a forest of oak or other hard wood, or that he possess an iron foundry or rolling

mill, or be engaged in the manufacture of brick, it would
be said that such conditions were unauthorized and would
entirely defeat the object of the law, viz.; competition, as
all these articles may be bought in abundant quantities in
the open market. But wherein do these conditions differ
from that in regard to stone? A bidder from Chicago or
St. Joseph might be a thoroughly competent builder, but
possess no quarry, but relying upon his ability to purchase
material in the market make a proposal which would be
met with refusal—not because he was not a responsible
man and able to complete his proposed contract—not be-
cause he in all probability would erect a substan-
tial building conforming in all respects to the plans and
specifications, but because he did not show that he had ex-
pended a large sum of money in preparation for a contract
that he might never receive. With as much propriety,
the board might impose a condition that the successful
bidder should be possessed of a certain amount of wealth
as evidence of his ability to perform his agreement. The
fact that a contractor tenders a satisfactory bond is evidence
of his good faith, and of his intention and ability to per-
form the contract, and that is all the security that the legisla-
ture has seen fit to require. There might be some propri-
ety perhaps in requiring a bidder to own a developed
quarry if the stone heretofore used in the east and west
wings was a rare and valuable kind, and unless the same
variety was used in the new building, there would be danger
of marring the appearance of the whole building. But the
testimony tends to show that the stone used does not com-
pare with many other varieties used in durability—that in
fact it is easily affected by the action of the weather, and is
not as durable as many other kinds; that it is found in
large quantities on both banks of the Platte river from
below Ashland to near its mouth; that the same quality of
rock is found in abundance in Otoe county, in western
Iowa, in Illinois, Ohio, and other places. The testimony

:also tends to show that the stone used in the west wing, built under the supervision of a committee of the senate :and house of representatives, is a fair quality of that kind of rock and nearly of a uniform color, although one witness testified, "the building is like Joseph's coat, so many colors that you would have to have a good many samples to tell the color." And the testimony also tends to show that a portion of it is filled with sand and clay streaks. There was no particular object therefore in obtaining rock from that particular quarry, as almost any change would seem to be beneficial. It will be observed that the statute simply provides that limestone shall be used as near of the color and texture of that heretofore used as practicable, and that no restriction is placed upon the contractor. He may obtain it wherever he can. But it is said that the legislature gave the board authority to adopt plans and specifications, and that as the specifications contained a condition that the party bidding should possess a stone quarry, that therefore this condition is authorized by law. The phrase, "plans and specifications," has a well defined meaning in this state at least. A plan when applied to a building in an architectural drawing representing the horizontal sections of the various floors or stories of the building, the disposition of apartments and walls, with the situation of the doors, windows—in fact represents the different stories as they are to be built, and the whole as it will appear when completed. The word "specifications" when applied to a building means a specific and detailed statement of the materials to be used in the building, and the manner of performing the work.

Any matter that does not relate to either of these is not included in the phrase "plans and specifications." The board of public lands and buildings is created by the constitution and its powers are defined as follows: It "shall perform such duties, and be subject to such rules and regulations as may be prescribed by law." The board pos-

sess no inherent power.  For every act that it performs it must produce its authority from the statute, and any act performed by it without statutory authority is null and void.

The condition in the specifications above referred to, therefore, being in excess of their authority, is a nullity. In the argument of the case, a great deal of stress was laid by Mr. Stout's attorneys upon the fact that the schedule filed by Silver did not cover all the articles in the specifications, and we were told that he thereby intended to defraud the state by leaving the dome and building unfinished.  It seems that the board required a schedule as a basis on which to make monthly estimates of the amount to which the contractor would be entitled, but they expressly provided that it should not be binding upon them. It has nothing to do with the contract, and whether properly made or entirely omitted, is immaterial.  Mr. Wilcox, the architect, stated on cross-examination that the only effect of the omission of certain articles from the schedule, was to deprive the builder of monthly payments thereon; but under the statute, as the superintendent is required to make monthly estimates from the *work performed* and *material furnished,* and as the schedule is entirely unauthorized by law it amounts to nothing and may be entirely disregarded.  But the same defect existed in the schedule of Mr. Stout, while his contained several thousand dollars as the value of frescoing which is not mentioned in the contract.  This objection therefore is untenable.

It is said, however, that the board of public lands and buildings is a co-ordinate branch of the government, created by the same constitution that created this court; that it is charged with certain duties which it is required to perform and that this court will not interfere with its action in the performance of these duties.  In other words that in the matter of letting contracts, the board has a discretion which will not be controlled by this court—is in fact, a law unto itself.

I concede that in any case where the law requires an officer to use his judgment in deciding a matter properly before him, that he cannot be compelled by mandamus to decide in a particular manner. Thus, the constitution imposes upon the governor the duty of examining bills passed by the legislature and approving or vetoing the same. He is clothed with the exclusive power to determine what his action shall be in the premises, being a part of the law-making power, and answerable alone to the people. His action therein therefore cannot be controlled. So in extradition cases, being a matter of state comity, mandamus will not lie, and the courts properly hold that they have no power to control the performance of purely executive and political functions. But where the duties required of him are purely ministerial—such as might with equal propriety be required at the hands of any other officer, mandamus will lie. *State v. Chase*, 5 O. S., 528. *Tenn. & Coosa R. Co. v. Moore*, 36 Ala., 371. *Cotten v. Ellis*, 7 Jones, 545. *Magruder v. Swann*, 25 Md., 173. *Middleton v. Low*, 30 Cal., 596. *Harpending v. Haight*, 39 Id., 189. High on Ex. Rem., § 119 and note. In a free government no officer is above the law, and if he fails to perform a clear duty mandamus will lie to compel performance.

The same rules apply to any other state officer, and no officer from the highest to the lowest is beyond the reach of mandamus if the duties required of him are purely ministerial. Thus, in *Hollister v. The Judges*, 8 O. S., 201, an application was made for a mandamus to compel the judges of the common pleas to restore to a bill of exceptions certain material words which it was alleged had been stricken out a retiring judge. The judges answered that having just by come upon the bench they knew nothing about the facts, and had no power over the clerk; but the supreme court held this was no defense. That it was their duty to require the parties to produce their proofs, and act upon such proofs in the same manner as in other cases that came before them,

and a peremptory writ was awarded. And the supreme court of the United States held that a judge who tried the cause would be compelled to sign the judgment record. *Ins. Co. v. Wilson*, 8 Peters, 291. And to settle-and sign a bill of exceptions. *Ex. parte Crane*, 5 Id., 189. So where the statute makes it the duty of a court or judge to approve official bonds, and a sufficient bond is tendered, mandamus will lie to compel its approval. *State v. Ely*, 43 Ala., 568. *Beck v. Jackson*, 43 Mo., 117. *People v. Fletcher*, 2 Scam., 482.

Neither does the fact that the board of public lands and buildings is created by the constitution withdraw it from the control of the courts. The board, although created by the constitution, is governed entirely by the provisions of the statute. Nearly all its duties are ministerial, and in the matter of letting contracts, there is no doubt that its duties are of that character. Having adopted plans and specifications, and invited bids thereon, its only duty in awarding the contract was to ascertain which was the lowest bidder, and if he had tendered a sufficient bond. These duties were purely ministerial in their nature, and neither require nor admit of the exercise of discretion. In the case of *Boren & Guckes v. Commissioners of Darke Co.*, 21 O. S., 311, the county commissioners of Darke county, who were entrusted with the management of its affairs, and possessed much greater powers than are given to the board of public lands and buildings, let a contract for the erection of a court house to the highest bidder. The court in effect held that the duties were ministerial; that, notwithstanding they had let the contract to the highest bidder, yet, as that contract was unauthorized, a peremptory mandamus was awarded compelling them to award the contract to him who was entitled to it—the lowest bidder. That case was followed in this state in the case of *The People v. Commissioners of Buffalo Co.*, 4 Neb., 150, and it is a fact well known that the district court of that county compelled the

commissioners of that county to let the contract for the erection of the bridge to the lowest bidder, which was done at $8.50 per lineal foot in place of $13, the bridge being more than 6,000 feet in length.

This case was followed and approved in that of *Follmer v. Nuckolls Co.*, 6 Neb., 204, and in *State v. York Co.*, 13 Neb., 57. In the case last cited, the county commissioners of York county had let the contract for supplies for the county to one not entitled to it, but this court compelled them to let it to the proper party. I think it will be difficult to apply a rule to county commissioners, who have greater powers than the board of public lands and buildings, and not apply the same rule to it. In support of the opposite view, we are referred to the case of the *People v. The Contracting Board*, 27 New York, 378, decided in 1863. In that case, the contracting board advertised for proposals to keep the Cayuga and Seneca canals in repairs for a series of years, the statute requiring them to let the contract to the lowest bidder. A certificate of deposit of $4,000 *in cash* in some banking house in good credit, payable to the auditor, was required of each bidder. The lowest bidder filed a certificate for four thousand dollars, omitting the words "in cash." Upon this pretext, the contracting board refused to consider his bid, and let the contract to the next highest bidder.

The supreme court granted a mandamus to compel the awarding of the contract to the lowest bidder. This decision was reversed by the court of appeals, Selden, J., dissenting. In the statement of facts, it clearly appears that the only reason the bid was rejected was because the words "in cash" were not in the certificate; yet Emmett, J., who delivered the opinion, affects to assume that some other reasons existed. The opinion is not very satisfactory, and fails to meet the questions at issue. In the dissenting opinion of Judge Selden, the objections, in the majority's opinion, are completely answered, and it is shown that the

decision is a complete departure from the former decisions in that state. The same court in the case of *Doolittle v. Supervisors*, 18 New York, 155, had held that a liability to increased taxation from illegal taxes affected all taxpayers alike, and that an action to enjoin the proceedings could only be brought by the proper public officer, and could not be brought by a private taxpayer. The taxpayers of the state being thus bound hand and foot, and the lowest bidders on a public contract having no rights which the courts would enforce, is it a matter of surprise that Tweed soon afterward seized the government of its chief city, and, under various pretended contracts, robbed it of millions of dollars?

Nor did the evil stop here, as it seems to have extended to all public contracts. Whether these robberies were the fruit of these decisions or not, I leave others to determine, but following as they did the decisions in question, there is certainly cause for reflection.

In the first case cited from New York, it is said in substance that the lowest bidder has no rights as such which the courts will enforce. The law is settled the other way in this state and Ohio, from whence our practice was copied, and it is unnecessary to discuss the question; but that our decisions are sustained by reason and the clear weight of authority, I think it is apparent. Our constitution provides that all courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation shall have a remedy by due course of law, and justice administered without denial or delay; yet it is proposed by this court, in the face of this plain constitutional provision, to close the doors of the court in certain cases; to hold that certain officers are above the law, and not amenable to the courts. The logical effect of the decision is that the board may let a contract for any sum that they please, and the court will not interfere. Such a power is liable to gross abuse, and the court has no legal or moral right thus to

deny to any citizen his rights. It was the boast of the common law that there was no wrong without a remedy, *ubi jus, ibi remedium.* *Johnstone v. Sutton*, 1 T. R., 512. Coke Litt., 197 b. Broom's Legal Maxims, 191. But here is a case in which the court refuses to grant any relief. In conclusion, I do not wish to impugn the motives or action of the members of the board. I have every reason to believe that they acted in good faith, and that there was simply an error of judgment. But the precedent is destructive of public virtue, and is liable hereafter to lead to great abuses and wrongs. In my view, the board should have accepted the lowest bid, or rejected both and advertised again for proposals; not having seen fit to reject both bids, the lowest bidder was entitled to the contract. A peremptory writ should therefore be awarded.