(December 30, 1910.)

# J. H. NAVE, Respondent, v. JAMES B. McGRANE, Appellant.

[113 Pac. 82.]

ARCHITECTURE—PLANS AND SPECIFICATIONS—SUFFICIENCY OF—CONFLICT IN EVIDENCE—INSTRUCTIONS.

(Syllabus by the court.)

1.   The plans and specifications for the construction of a large building should be definite, specific and certain, in justice both to the contractor and the owner.

2.   The testimony of a contractor or contractors to the effect that certain plans and specifications are sufficient will not be taken as against the plans and specifications themselves, when they clearly show that they are not definite and certain, and against the recognized authorities on engineering, contracts and specifications and architecture, and especially is that true where the plans and specifications will permit the bidder or contractor to figure on first-class and expensive material and are not specific enough to prevent his using an inferior material of a less value.

3.   It is the duty of the architect to obtain from the owner all facts necessary to enable him to prepare proper plans and specifications for the proposed building.

4.   The architect should prepare a contract as a part of the plans and specifications, between the owner and the contractor for the construction of a proposed structure, in order to intelligently protect both parties thereto, as the owner, as a rule, has not a sufficient knowledge of such matters to know the details of such a contract.

5.   Specifications in architecture embrace, as understood by the profession, not only the dimensions and mode of construction, but a description of the material, its kind, length, breadth and thickness, and the manner of joining the separate parts. It is a particular and detailed account of a thing; the accurate description of the materials to be used and work to be performed in the construction of a building; a written instrument containing a good, minute description, account or enumeration of particulars.

6.   The plans and specifications must be definite and certain as to the kinds and qualities of materials to be used and the class of workmanship, the time within which the building must be completed, the method of making payments, and matters relating to the insurance of the structure during its construction, and unless the plans

and specifications are thus definite, the bid to construct the building would only indicate a willingness to negotiate further in regard to the matters not specified.

7. *Held,* that the specifications in regard to the foundation of the building are not sufficiently specific.

8. *Held,* that the plans and specifications in regard to the electric wiring of the building are not sufficiently definite and certain.

9. Where the specification for the electric wiring provides that "the wiring must all be according to the latest improved methods according to the city ordinance, and the rules and regulations of the under writes, subject to their inspection," etc., and the court refuses to permit the defendant to show on cross-examination of the plaintiff that if the rules and regulations referred to constitute the National Electric Code, which is accepted as fire underwriters' regulations, such code authorizes the wiring in several different ways and that different kinds of material, some more expensive than others, may be used, the refusal of the court to admit such evidence *held,* error.

10. The trial court must avoid remarks that tend to give to the jury the impression that counsel is asking foolish questions and trifling with the court, and thus create prejudice.

11. The specifications for plumbing and heating are indefinite and uncertain.

12. There is an implied understanding upon the employment of an architect that the work shall be suitable and capable of being used for the purposes for which it is intended, and apart from questions of public policy this principle would prevent the architect from recovering payment for plans and specifications prepared in violation of law, unless he was so directed to prepare them by the owner.

13. *Held,* that the court erred in refusing to give plaintiff's instructions 1 to 13, inclusive, or instructions substantially covering the same ground.

APPEAL from the District Court of the Second Judicial District, for the County of Nez Perce. Hon. Edgar C. Steele, Judge.

Action to recover for plans and specifications for the construction of a building. Judgment for plaintiff. *Reversed.*

E. A. Cox, for Appellant.

An architect, like any other professional man, impliedly holds himself out as possessing skill and knowledge which his

clients do not have themselves. His position is one of trust and confidence. To this extent the ordinary law of contracts is modified by the relation of the parties. An architect who hands his client a bundle of incomprehensible drawings and figures, which are received by reason of the faith and confidence of his client in himself, cannot contend that his work has been accepted. (*Louisiana Molasses Co. v. Le Sassier*, 52 La. Ann. 2070, 28 So. 217; 1 Cyc. of Architecture, pp. (bottom number) 350, 351.)

" 'Specifications' in architecture embrace, as understood by the profession, not only the dimensions and mode of construction, but a description of every piece of material, its kind, length, breadth and thickness, and the manner of joining the separate parts together." (*Gilbert v. United States*, 1 Court of Claims, 28, 34; *State v. Kendall*, 15 Neb. 262, 18 N. W. 85, 90.)

"An agreement to enter into a contract in the future must contain all the material and essential terms of such future contract." (*Shepard v. Carpenter*, 54 Minn. 153, 55 N. W. 906.)

It is necessary, in order that the meaning of the specifications shall be clear, to indicate whether the proportions by volume shall be taken with the cement in the original package, or in a loose state, after having been emptied from such package. In any case, the engineer should decide which method he proposes to adopt, and reveal this decision in the specifications themselves. (Johnson, Engineering Contracts and Specifications, pp. 137, 138.)

The masonry specification is altogether too indefinite to insure good work. In the one point upon which it is definite, it is contrary to the building ordinance of the city and contrary to the custom and usage of architects. The specification provides that the wall shall be "slushed solid with good lime and sand mortar." (1 Ency. of Architecture, bot. pp. 112, 113, 218.)

Each requirement should be so carefully written that there can be only one interpretation, leaving no doubt as to its true intent. (1 Ency. of Architecture, bot. p. 276, top p. 70.)

A practicing architect should familiarize himself with such laws of the state and such ordinances of the town or city in which he is employed as especially apply to his work. (*Idem*, bot. pp. 338, 339, 351.)

In case of an architect, as in the case of any other worker, there is always an implied contract that his work shall be suitable and capable of being used for the purpose for which it is prepared. (*Straus v. Buchman*, 96 App. Div. 270, 89 N. Y. Supp. 226; *Hubert v. Aitken*, 15 Daly, 237, 2 N. Y. Supp. 711, 5 N. Y. Supp. 839; affirmed, 123 N. Y. 655, 25 N. E. 954; *Kinney v. Manitowoc County*, 135 Fed. 491, 68 C. C. A. 203; *Dunne v. Robinson*, 53 Misc. Rep. 545, 103 N. Y. Supp. 878.)

Chas. L. McDonald, for Respondent, cites no authorities.

SULLIVAN, C. J.—This is an action to recover the alleged contract price for certain building plans and specifications, prepared by plaintiff, as an architect, for the defendant. The case was tried by a jury, and from the judgment for plaintiff and from an order overruling a new trial this appeal is taken.

The case presents for determination questions relating to the duties and responsibilities arising from this class of professional services. A number of errors are assigned in regard to the admission and rejection of evidence and the giving and refusing to give certain instructions. The facts are substantially as follows:

The defendant is the lessee of the Bollinger Hotel in Lewiston and the owner of certain adjacent lots, upon which in 1908 he contemplated erecting an addition to the hotel. The plaintiff, an architect, in the same city, learning of the defendant's intention, went to him and solicited the work of drawing the plans and specifications and supervising the construction. Sketches for the building were prepared and then the defendant temporarily abandoned the project. A little later he decided to erect a somewhat larger building, for which the plaintiff prepared plans and specifications. That construction was likewise abandoned, and defendant pre-

sented a bill for $240 for his services up to that time. By agreement the claim was reduced to $120, as none of the plans had been used and that amount was paid and accepted in full. In December, 1908, the defendant decided to erect a larger and more substantial building than he had previously contemplated. As an inducement for the defendant to employ plaintiff in connection with the last building, plaintiff offered to let $60 of the amount paid him for his prior work apply on the new contract. The parties finally agreed that plaintiff should prepare the plans and specifications. The plaintiff testified that he was to prepare the plans and specifications for three per cent of the estimated cost, to be determined by the lowest responsible bid, if the building was not constructed, and if the building was constructed and he supervised the construction, then he was to receive five per cent of the cost, less $60. The defendant testified that if the plans were not used, he was not to be charged the full three per cent, but some reasonable sum was to be agreed upon. He also testified that he directed plans and specifications prepared for a building not to exceed a cost of $10,000; that the building was to consist of one story and a basement, so constructed that three additional stories could be built on in the future, making in all four stories and basement; and that the plaintiff "guaranteed" that he would make the plans and specifications and do his work to the satisfaction of the defendant. Plaintiff denied that any limit of cost was placed on the building. He also denied that he was to prepare his plans for a four-story construction. However, in the general specifications prepared and introduced in evidence, the plaintiff states as follows: "All brick used throughout the building must be good, hard-burned, merchantable, common stock brick, as the character of the stone and concrete provides for four-story construction," etc. Also under the head of plumbing it is stated: "All pipes must be sufficient in size to accommodate the plumbing of four stories." These specifications themselves would indicate that the plaintiff understood that they were to be sufficient for a four-story building.

It is claimed by the defendant that there was some delay in preparing the plans and submitting them, but they were finally delivered, but contained no form of contract or bid and no bond for the construction of said building. The defendant, not being an architect, knew nothing about plans and specifications and supposed those delivered to him were complete and skillfully drawn. Notice for bids was published and three bids, all in excess of $10,000, were received and rejected, and it is contended by counsel for defendant that the plans and specifications were defective in regard to the foundation, concrete work, wiring, plumbing, etc.; that they did not contain the date of beginning work; the date of completion; the time or manner of payment; whether work should be continuous or intermittent; the amount and character of indemnity against personal injury or against liens; provision for security for the faithful performance of the contract; for the amount of penalty for delay; or for insuring the building during the construction; some of which provisions should have been contained in a contract. The specifications recite that they are a part of the contract, but no contract or bond was prepared and submitted. At the trial the plaintiff offered to show that a certain blank form of contract was the one he had in mind, but as neither the owner nor the bidders knew of it or had in mind any agreement in reference to it, it was rejected.

It is contended that the defendant was in no position to call for bids at the time they were advertised for; that they were not offers for the performance of a contract submitted, as no contract was submitted; that they were merely an expression on the part of the bidders of a willingness to negotiate further toward arriving at a contract, the terms of which were yet to be agreed upon, and that no bids in the ordinary sense of the word were received. Defendant became doubtful as to the sufficiency of the plans, and testified that he requested the plaintiff to strengthen the building by putting in iron pillars and take the weight off the partitions, and plaintiff became angry and refused to make any changes. Defendant then retained the services of architects from Spo-

kane and procured entirely new plans and specifications and constructed an entirely differently planned building. He did not use the plaintiff's plans, and the only copy which he had was a carbon copy of the specifications and a blue-print of the plans, which were not called for by the plaintiff, and which remained in the defendant's desk until the trial, when they were filed in evidence.

Two expert architects testified that the foundation was not strong enough to support a four-story building, and both testified that they had doubts about its being safe for a three-story building. There was a direct conflict in the evidence on several points, and the verdict of the jury would be conclusive, so far as those facts are concerned, upon a fair trial. But it is contended by counsel for defendant that he did not have a fair trial, because certain material evidence offered was rejected by the court. Plaintiff introduced his plans and specifications as evidence of the performance of his contract. The burden of showing their inadequacy was upon the defendant. No doubt, without explanation of the plans and specifications, the jury would be in the same hopeless condition as the defendant, who testified that so far as his own knowledge went, he was unable to determine whether the plans were adequate for one or fifteen stories.

It is contended that there is a conflict in the testimony, and that under the well-established rule of this court the verdict of a jury on conflicting evidence will not be reversed. As we view it, there is not a substantial conflict in the evidence in this case. The testimony of a contractor or contractors to the effect that certain plans and specifications are sufficiently definite and specific to enable them to bid on the construction of a building will not be taken as against the plans and specifications themselves when they clearly show that they are not definite and certain and are not in conformity with the recognized authorities on engineering, contracts, and specifications and architecture; and especially is that true where the plans and specifications will permit the bidder or contractor to figure on first-class material and first-class workmanship, but are not explicit enough to prevent his using

inferior material and poor workmanship in the construction of the building. Specifications ought to be so definite as not to leave the quality of the material or of the workmanship in the construction of any part of the building to the mutatory whim or caprice of the supervising architect or contractor. In justice to both the owner and contractors, the plans and specifications and the contract for the construction of the building should be complete, definite and specific.

It is clear from the pleadings, the written documents and the testimony of the parties that plaintiff undertook to furnish complete plans and specifications to do whatever was necessary according to the use and custom of architects and builders to enable defendant to receive bids and let a contract and to accept his compensation therefor, which was to be a percentage of the lowest responsible bid. To perform his agreement according to the ordinary rules of his profession, it was necessary for him to furnish preliminary sketches and estimates in order to avoid any mutual mistakes; also detailed and complete plans and specifications, and if requested, estimates of the quantities and costs of material, the proper contract to be entered into by the contractor, including the time of beginning and completion of the building, the dates and rates of payment and the kind and amount of indemnity insurance to be carried, and other necessary details; a proper form of bond, so that the owner might know what security he was to have against liens and injuries and that the bidders might understand to what expense they would be put by this item, and the terms upon which they would be held; proper instructions to the bidder to prevent mistakes and misunderstandings; and there are usually furnished forms of proposals for bidders to permit competitive bidders to do the same work in the same manner. The plans, specifications, contract and bond should be so specific that there could be no valid controversy as to the kinds and quality of materials to be used or the workmanship, the time when the construction should begin and when completed, and the other matters above stated.

If the plans and specifications conform to the above requirements under the pleadings and proof, the plaintiff was entitled to recover compensation therefor.

In *Louisiana Molasses Co. v. Le Sassier*, 52 La. Ann. 2070, 28 So. 217, it was held that "Architecture is the art of building according to certain determined rules. The owner does not know the rules. He employs an architect, who makes the plans in accordance with them."

In vol. 1, Cyclopedia of Architecture, pp. 350, 351 (bottom number), it is stated:

"An architect, like any other professional man, impliedly contracts with his employer that he has the ordinary skill, knowledge and judgment possessed by men of his profession, and that he will use this skill, care and judgment in the interest of his employer and will act with perfect honesty. . . . . In a general way, it may be said that this knowledge and skill required includes the knowledge and skill necessary to planning buildings or parts of buildings such as those planned by the architect, a knowledge of the qualities and strength of materials used in such buildings, the weight of the structures, the relationship of the various operations to be performed by the many trades represented in building, and a knowledge of all other matters directly related to drawing plans and specifications."

The owner may not know all of the facts necessary to be imparted to the architect to enable him to prepare proper plans and specifications, and it is the duty of the architect to obtain from the owner just what information and facts he requires in order to prepare the proper plans and specifications; hence if the plans did not fulfill the owner's intentions because the architect did not have sufficient information, it was the fault of the architect in not getting such information, as he should know better than the owner just what facts and information is needed to intelligently draw the required plans and specifications. Much of the trouble between contractors and owners arises from plans and specifications not being as definite and certain as they ought to be. As a rule, the owner knows nothing about the details of the contract that the con-

tractor ought to sign in order to protect the owner, and this is left almost wholly with the architect.

It seems that the owner's instructions to the plaintiff were to prepare plans and specifications for a building of one story and basement, so constructed and of sufficient strength that certain additional stories could be added in the future. To do this required not only that the foundation and walls should be strong enough to carry the additional stories, but that the part constructed should be designed and planned with reference to those additional stories, and that at least the general nature of such future construction be sketched that the plan might be consistently carried out without danger. The plumbing, heating, lighting, furnace flues, stairways and interior arrangement would all have to be designed with reference to the future construction. To comply with his instructions in any reasonably skillful and prudent manner, it was necessary for the architect to inquire as to the number of stories to be added and at least, generally, as to their purpose and arrangement and means of access from one to another. It appears from the record that the plaintiff did not do this.

In *Gilbert v. United States*, 1 Court of Claims, p. 28, citing Ency. of Architecture, p. 595, par. 19, it is said:

" 'Specifications,' in architecture, embrace, as understood by the profession, not only the dimensions and mode of construction, but a description of every piece of material, its kind, length, breadth and thickness, and the manner of joining the separate parts together. Bouvier defines them as 'a particular and detailed account of a thing'; Gwilt: 'They are an accurate description of the materials and work to be used and performed in the execution of a building'; Worcest. Dict.: 'A written instrument containing a good and minute description, account, or enumeration of particulars.' "

In *State v. Kendall*, 15 Neb. 262, 18 N. W. 85, the court said:

"A plan, when applied to a building, is an architectural drawing representing the horizontal sections of the various floors or stories of the building, the disposition of apartments

and walls, with the situation of the doors, windows—in fact, represents the different stories as they are to be built, and the whole as it will appear when completed. The word 'specifications,' when applied to a building, means a specific and detailed statement of the materials to be used in the building, and the manner of performing the work.''

In Engineering Contracts and Specifications, by Prof. J. B. Johnson, Dean of the College of Mechanics and Engineering, University of Wisconsin, p. 47, it is said:

''In order that there shall be no misunderstanding in regard to the intentions of the designer, plans are usually drawn showing the general and detail features of the work, and accompanying these there is a written description of the work, of the materials to be used, of the time and manner of payments, etc. This document is called the specifications. The drawings and this description are referred to as plans and specifications. In order to get open and general competition in doing the work, a date is set on which bids will be received, and blank forms of proposals are prepared by the engineer which can be filled out by the bidders.''

In vol. 1, Ency. of Architecture, p. 362 (bottom number), the author says:

''The plans when completed should (1) conform with the instructions given the architect, (2) comply with all laws which may be applicable, (3) not infringe the rights of any third person, (4) be in accordance with all rules of the architect's science and art. It must be remembered that the employer's mere approval will not be an excuse for faults, of which the employer is not a competent judge.''

If the plans and specifications were not definite and certain as to the kinds and qualities of material to be used, the class of workmanship, etc., the time within which the building must be completed, the method of making payments and other matters, the bid to construct the building would only indicate a willingness to negotiate further in regard to the matters not specified, and its acceptance would express a like willingness but would not bind either party. If they did not

subsequently agree upon a contract, each would be without remedy against the other.

In *Gill Mfg. Co. v. Hurd,* 18 Fed. 673, the court held that in order to constitute a contract, the minds of the parties must meet and agree upon the terms of it. If any part remains to be settled, the agreement is incomplete.

In *Shepard v. Carpenter,* 54 Minn. 153, 55 N. W. 906, the court held that an agreement to enter into a contract in the future, in order to be enforceable, must express all the material and essential terms of such future contract, and not leave any of them to be agreed on in the future.

Usually the first question that occurs to the owner is the cost of the building, and he generally requests the architect to compute the cost of the several items going into the construction of the building so as to ascertain the total cost. A transverse section is one of the necessary drawings to accompany the specifications, and it is contended by counsel for appellant that an examination of the plans will disclose that no transverse section was ever made.

A ten-foot excavation is provided for within two feet of the Bollinger Hotel and to the street line on two sides of the property. We find no provision in the specifications for protecting the walls and foundation of the Bollinger Hotel, nor for protecting the other lines of the property from caving. It would seem that the specifications are defective in that regard, for if no provision is made therefor and the question should arise as to whether the contractor was required to make adequate protection for the contract price, the contractor would contend that it was the duty of the owner to furnish such protection. It is to avoid such complications that plans and specifications are required to be complete and specific.

The specifications required certain concrete work to be done. Concrete is a comparatively new building material, and the specifications provide that the contractor shall proceed to build concrete footings for all piers, walls, caves, etc., according to dimensions as shown by Drawing 1, and after specifying the kind of cement that may be used, says: "And proportioned as follows: To one measure of cement add five parts

of broken stone and three parts of sand. These materials must be carefully measured and must not exceed these proportions.'' Counsel contends that this specification is not sufficient for the reason that cement usually comes tightly packed in bags or barrels and on account of its loose, fluffy condition fills two or three times as much space when poured out of the original package as it did when tightly packed. If measured in this condition, only half as much cement will be used as is used in making good concrete, and therefore it is absolutely necessary to specify how the concrete shall be measured, and in support of that contention counsel cites Engineering Contracts and Specifications, by Johnson, p. 137, where it is stated as follows:

''A cement mortar is a thorough mixture of sand with cement, first in the dry state, . . . . In specifying the proportions of sand and cement to be used in making up a cement mortar, it is customary simply to name so many parts of sand to one part of cement by measure. It would, as a rule, be inconvenient to determine this ratio by weight, but a determination by measure is subject to serious objections. For instance, a barrel or original package of cement, when dumped or turned out upon a mixing platform in a loose and fluffy condition will have 50 per cent more volume than it had in the original package. It is necessary, therefore, in order that the meaning of the specifications shall be clear, to indicate whether the proportions by volume shall be taken with the cement in the original package, or in a loose state, after having been emptied from such package. . . . . In any case, the engineer should decide which method he proposes to adopt, and reveal this decision in the specifications themselves. It is not sufficient to say that one barrel of cement shall be used for so many barrels of sand, thinking thus to have the cement measured in the original package, since American cement is commonly delivered in sacks, and to get it into a barrel it would require the measurement of the cement in a loose condition.''

At page 138, the same author says:

"The cement shall be measured when so compacted that 300 pounds of dry natural cement or 380 pounds of dry Portland cement have a volume of 3.6 cubic feet. The sand and stone shall be measured when not packed more closely than by throwing them in the usual way into a barrel or box."

It would seem from this authority that the specification made by the plaintiff of the concrete work was not sufficient, as it does not indicate whether the cement must be measured in the loose, fluffy condition above described or in the compact condition of the original package. It will be observed at once how very important it is to designate the method of measuring the cement, for if in the loose condition, the same measure would contain one-half less than if measured in the compact condition. If the specification simply requires one measure of cement to certain other measures of rock and sand, and fails to indicate in what condition the cement must be measured, the contractor may measure it in its loose, fluffy condition, thereby using one-half less cement than he would if measured as found in the original package. It is therefore important that the measurement of the cement should not be left to the will of the contractor, unless it is so left with the consent of the owner. Said specification is not, therefore, as specific as it ought to be.

The specifications for the foundation do not appear to be specific and complete. They are too indefinite to insure good masonry. The specification provides that the walls shall be "slushed solid with good lime and sand mortar," while the building ordinance, No. ——, of the city of Lewiston, provides that mortar below water shall be no poorer than one part good Portland cement and three parts of sand; and mortar used for foundations of buildings within fire limits shall be no poorer than one part good Portland cement and eight parts of lime mortar, made with A-No. 1 fresh slack lime with the proper proportion of sand.

In vol. 1, Ency. of Architecture, p. 112 (bottom number), it is stated:

"All masonry work below ground should be laid in cement mortar and all arches or heavily loaded piers as well. In many city laws the use of cement mortar is required to a certain proportion of the height of the wall."

And at page 113: "Lime mortar does not possess the 'setting' quality of cement, but gradually hardens by exposure to the air. Lime mortar does not harden under water or in very damp situations."

The specification for electric wiring is as follows:

"The contractor will wire the building for electric lights making provision for a drop light where marked D L on drawing No. 3, he will also make provisions in basement for 12 lights where directed by Supt. The wiring must all be according to the latest improved methods according to the city ordinance and the rules and regulations of the under writes subject to their inspection, all rooms must have flush switches placed where directed, all fuse boxes, cut-outs, etc., must be installed where architect directs, connection will be made to the building by the underground system and complete installation furnished by the contractor. Under this contract the contractor will not furnish any light fixtures."

That specification does not indicate where the wiring will be taken in or out of the building; the kind, quality or weight of wire to be used; the kind or length of insulated cords; whether the wires shall be suspended on cleats or knobs; whether rubber, porcelain, clay or glass insulation shall be furnished; whether the wiring shall be concealed or run along the walls or ceiling by cleats; the kind, character, location or number of flush switches, cut-outs, fuse-boxes, or any other apparatus. It does not provide for wireways so that concealed wiring may be permanently accessible, nor for any meters, nor determine whether the whole building shall be on one or more circuits, nor provide for distribution of the load and grouping of cut-outs if branch circuits are adopted. It does not even specify whether the building is to be wired for an alternating or direct current connection. This specification analyzed provides for nothing more than that the building shall be wired according to the city ordinance and

the rules of the National Electric Code which contains the regulations used by fire underwriters. Neither the ordinance nor the Electric Code, as we understand them, specifies just the class or kind of wire and other material that shall be used in wiring buildings, but simply formulates the general principles according to which electrical work must be done. The plaintiff while on the witness-stand admitted this specification did not conform to any recognized authority, but claimed that any deficiency therein was cured by reference to the ordinance and said Electric Code recognized by fire underwriters, and counsel for defendant undertook to show the defect in this particular specification on cross-examination of plaintiff but was not permitted to do so by the court. He undertook to show that said Electric Code had reference merely to general principles or general regulations and not specific. The following question was propounded to plaintiff:

"Q. The regulations in the National Electric Code, which is the fire underwriters' regulations that you speak of, are merely general regulations saying that certain kinds of materials shall be used in certain buildings?"

To which objection was made as not being proper cross-examination. The court sustained the objection and remarked: "I will not permit it to go further. You may have an exception." The witness had undertaken in his direct testimony to help out said specification and claimed that the reference to the "under writes," evidently meaning the fire underwriters, was sufficient to make it specific, and counsel on cross-examination undertook to show that said Code merely contained general regulations and nothing in regard to the particular material to be used in wiring, and the court refused to permit him to do so. This was error. Witness Loring, an expert architect, testified that there were several different methods of installing electric wiring and that the said Electric Code specifications did not indicate which method was designated. The following question was asked:

"Q. Any one of these several methods would conform to the National Electric Code of the Underwriters, would it not?"

Opposing counsel said, ''I do not know what that is.''

The Court: ''I don't either; I think you better get along with this case.''

Witness: ''There are three or four that I recall—three that I recall which would conform to the Underwriters' Code.''

''Q.  Do you know of any association or other thing designated by the name of 'Underwrites'?''

McDonald: ''There is evidently a clerical mistake.  We object to that.  If they can't base their defense on something more definite than that, they better quit.''

The Court: ''You can argue this later to the jury.  I will sustain the objection.''

As the court refused to allow the witness to answer the question, we fail to understand the relevancy of the court's remark to the effect that counsel could argue that later to the jury.

''Q.  Is any provision made by that specification for the character of tubing or knobs or insulation?''

Objected to as incompetent, irrelevant and not the best evidence.  Sustained.  Exception.

The court not only excluded from the jury all evidence essential to the intelligent comprehension of the sufficiency of that specification, but by his rulings and remarks and the remarks of plaintiff's counsel, defendant was held up to the jury as delaying the case, asking foolish questions and trifling with the court.  There was clearly error in all of this.  This case involved the question whether the plans and specifications referred to were specific and sufficient for the purpose for which they were intended, and the court absolutely refused to permit appellant to introduce evidence to show that said plans and specifications were defective.  That was one of the main issues, as it was contended that the plans and specifications were not sufficient for the purposes for which they were intended.

The plumbing and heating specifications are indefinite and uncertain, and leave too much to the mutatory whims of the contractor or supervising architect.

The specifications are also defective in that they do not provide for any certificate of inspection by the architect nor whether any insurance should be carried pending the completion of the building. They make no provision for the modification of the plans as the work progresses, and they contain no stipulation in regard to changes, extras, nor to extra work.

In 1 Ency. of Architecture, top p. 70, the author says: "Each requirement should be so carefully written that there can be only one interpretation, leaving no doubt as to its true intent. If the specifier hopes to get better work through some hidden meaning in the specification, he is doomed to disappointment; for the more expensive interpretation will be used by the contractor in making up his bid; and later, when the work is required, the contractor may plead that, on account of the uncertainty of meaning he should not be required to furnish any part without extra compensation."

Reference is also here made to pp. 24 and 25 of said authority, which refers to architects having knowledge of the statute law, and the ordinances of the city, and says: "Moreover, it will be seen later that a person employing an architect has a right to rely on the architect's knowledge of building regulations; so that the latter will be liable to his employer if through his ignorance the laws are infringed and the employer suffers."

And at p. 37, it is said: "In addition to this knowledge of the fundamental laws of nature, of materials, etc., an architect represents himself as possessed of a knowledge of the statutes, ordinances, and laws relating to buildings and to the erection of buildings of the place where the structure is to be located."

So far as an architect is concerned, there is always an implied contract that the work shall be suitable and capable of being used for the purpose for which it is prepared. Apart from questions of public policy, this principle would prevent him from recovering upon plans and specifications

prepared in violation of law, unless he was directed to so prepare them by the owner.

In *Straus v. Buchman,* 96 App. Div. 270, 89 N. Y. Supp. 226, the court said:

"It was for the purpose of protecting himself against just such defects and improper workmanship that he employed the defendants as superintending architects, and, in the performance of their duties under the contract, they were bound to exercise reasonable care and diligence in supervising the work. . . . . The placing of these timbers, and the manner in which they were secured, was not only a serious defect, but a direct violation of the statute in force at that time relating to the construction of buildings in the city of New York, which provided that 'in no case shall either end of a beam or beams rest on stud partitions.' It was the duty of the defendants, under their contract with plaintiff, not only to see that the beams were properly placed, but especially to see that the placing of them conformed to the requirements of the statute. This they failed to do."

In *Hubert v. Aitken,* 15 Daly, 237, 2 N. Y. Supp. 711, 5 N. Y. Supp. 839, the court said:

"No one would contend that at this day an architect could shelter himself behind the plumber, and excuse his ignorance of the ordinary appliances for sanitary ventilation by saying that he was not an expert in the trade of plumbing. He is an expert in carpentry, in cements, in mortar, in the strength of materials, in the art of constructing the walls, the floors, the staircases, the roofs, and is in duty bound to possess reasonable skill and knowledge as to all these things."

See, also, *Kinney v. Manitowoc County,* 135 Fed. 491, 68 C. C. A. 203.

Clearly, according to the authorities on architecture, engineering contracts and specifications, said plans and specifications were not sufficient for the purpose for which they were intended.

The court erred in refusing to give plaintiff's instructions Nos. 1 to 13, inclusive, or instructions embodying the same principles of law.

It will serve no good purpose to grant a new trial in this case. The judgment is reversed and the case remanded, with instructions to the trial court to render judgment in favor of appellant. Costs are awarded in favor of appellant.

Ailshie, J., concurs.