NEVADA BANK OF COMMERCE, a Nevada Corporation, Appellant and Cross-Respondent, v. THREE SEAS CORPORATION, a Nevada Corporation, Respondent and Cross-Appellant.

No. 5523

November 8, 1968                    446 P.2d 647

[Rehearing denied December 9, 1968]

*Singleton, DeLanoy, Jemison & Reid,* of Las Vegas, for Appellant and Cross-Respondent.

*Foley Brothers,* of Las Vegas, for Respondent and Cross-Appellant.

## OPINION

By the Court, MOWBRAY, J.:

Nevada Bank of Commerce appeals from a judgment of $16,050 awarded respondent, Three Seas Corporation, for damages resulting from breach of a lease agreement between the parties. Respondent has cross-appealed, claiming interest due on the $16,050 award and additional damages of $16,721, representing certain improvements to the leased premises which appellant was bound by the lease agreement to install. The trial judge before whom the case was tried found that the parties had entered into a binding written lease agreement and were bound by its terms. To this finding the appellant strenuously objects, upon the grounds that the parties failed to reach a binding agreement because appellant never approved *in writing* the plans and specifications covering the finishing and refurbishing of the leased premises.

The record discloses that the parties began negotiations in December 1963 for the rental of the ground floor of respondent's building, which appellant desired to lease for use as a temporary banking facility. Appellant desired the facility for a short period only, as plans were under consideration for the construction of permanent quarters by First Western Financial Corporation of Las Vegas, which corporation had earlier, in August 1963, purchased practically all (99.06 percent) of appellant's stock. Mr. Melvin Moss, Executive Vice President of First Western Financial Corporation, with appellant's

approval and authority, negotiated with Mr. Joseph Foley, a Director of respondent, and agreed upon a 1-year, ground-floor lease in respondent's building, with two successive 1-year options for renewal.

Since the ground-floor space to be rented required finishing and refurbishing, so that it could be used for the purposes intended, two rental alternatives were discussed: (1) Respondent agreed to bear the costs of finishing and refurbishing, in which event appellant agreed to pay a monthly rental of 65 cents per square foot, or (2) appellant agreed to pay the costs to be incurred in the finishing and refurbishing, in which event the agreed monthly rental would be reduced to 45 cents per square foot. It was understood that the cost of the improvements was estimated at about $15,000, not considering the contractor's fee.

The second proposal was agreed upon, and the parties reduced their agreement to a written lease. The lease was signed and acknowledged on January 27, 1964, by appellant's corporate officers, President D. B. Bates and Secretary D. R. Heidrich. The agreement contained the following rental provisions:

"2.          RENTAL PROVISIONS

"(a) The Lessee shall pay to the Lessor as and for rent for the premises the sum of $16,050.00 per year, and in addition thereto, a sum equal to the total cost to Lessor for the fabrication and installation of a ceiling, lighting fixtures, power outlets, heating and air-conditioning duct work, flooring, and alterations to the entrance or entrances done pursuant to plans and specifications approved in writing by the Lessee.

"(b) The said sum of $16,050.00, together with the cost of the improvements above described, shall be payable by the Lessee in 12 equal monthly installments commencing on the 15th day of March, 1964, and continuing thereafter on the 15th day of each month."

Appellant urges that, since the final plans and specifications for the finishing and refurbishing were never formally approved in writing by the lessee, the parties never did in fact reach a mutual understanding and therefore the trial court erred in finding that they had effected a binding contract.

We appreciate fully that "plans and specifications" have a most significant and vital meaning in the construction trades and are certainly not an owner's instruction to the architect, Nave v. McGrane, 113 P. 82 (Idaho 1910), nor a general

outline of the work to be done, Jenks v. Town of Terry, 40 So. 641 (Miss. 1906), but do include the dimensions and mode of construction and a detailed description of the materials to be utilized in the building to be constructed, and therefore must be thoroughly understood and agreed upon by the parties.

The principal issue for our consideration in this appeal is whether the record before the trial court will support the trial judge's finding that the plans and specifications were approved by the appellant and that a contract was entered into by the parties, whether it be January 27 or some later date.

The plans and specifications (admitted as Exhibit H) were prepared by the architect and submitted to the appellant on January 27. They were reviewed by appellant's Secretary, D. R. Heidrich. Mr. Heidrich prepared a list of nine changes to the proposed plans—none as to the specifications—and returned to the architect the plans and specifications containing the changes indicated, with an attached list of the specified changes (Exhibit I) *which Mr. Heidrich had signed.*

The architect then prepared Exhibit J (the final plans and specifications), which was in accordance with Exhibit H (the original plans and specifications) with the changes designated in Exhibit I. Exhibit J was let out for bids. Several were received, and the low bid of Martin Construction Company of $16,721 was accepted and approved by the appellant. Mr. Bates, President of the appellant, testified in substance during the trial that he had reviewed the plans and specifications with Mr. Heidrich, and knew of and approved Exhibit I and also the final bid of Martin Construction Company.

## "DIRECT EXAMINATION

by MR. FOLEY:

"Q. Will you state your name, please?

"A. Donald B. Bates,

"* * *

"Q. Now, Mr. Bates, you signed the lease that's in evidence here as Exhibit F?

"A. Yes.

"Q. All right. Now, Mr. Bates, were you furnished the plans and specifications that are Exhibit H in evidence?

"A. I have never seen these before.

"* * *

"Q. Yes. Would you read on over to page 10 of that [Mr. Bates'] deposition. Read it to yourself, Mr. Bates, and then I will ask you the question.

"A. Okay.

"(Witness complies.)

"A. I said I saw them and I don't remember it. I guess I did. I said I did then.

"* * *

"Q. And you recall reviewing this [sic] plans which are Exhibit H in evidence?

"A. Yes.

"Q. And they were sent back with changes?

"A. Yes.

"* * *

"Q. Now—

"A. But I—Del [Mr. Heidrich] consulted me on all these plans and I went along with him on all of them. As you know what we were trying to do was get the bank open, period.

"Q. Now, you were told about the bids, were you not, that were received?

"A. Yes.

"Q. Mr. Moss told you about them, didn't he?

"A. Yes.

"Q. And you knew the high bid and you knew the low bid?

"A. Yes.

"Q. And you had no objection to it?

"A. Well—

"Q. Can you say yes or no?

"A. I said the other day I had no objection to it."

The record discloses that Mr. Moss approved the bid and was desirous to have the premises readied for use at the earliest possible date.

## "DIRECT EXAMINATION

by MR. FOLEY:

"Q. Would you state your name, please?

"A. La Marr Dees.

"Q. And your address?

"A. 1390 Creek Side, Apartment 12, Walnut Creek, California.

"Q. Mr. Dees, have you ever been an employee of Mr. James McDaniel, an architect?

"A. That is correct."

(Mr. McDaniel was the principal architect involved throughout the transactions of the parties.)

And further:

"Q. And what did [you] do with respect to those change requests?

"A. In reference to the memo and to drawings I, they were incorporated into our drawings and we reprinted them and sent out revised drawings which was delivered to each one of the bidding contractors and to Mr. Moss and to the Three Seas Corporation.

"Q. And was that Exhibit J?

"A. Exhibit J.

"* * *

"Q. And you delivered a copy of Exhibit J to Mr. Moss on that date [February 3, 1964]?

"A. That is correct.

"Q. And thereafter, Mr. Dees, what next occurred then, after you got the bidding out?

"A. We received bids in duplicate from the General Contractors on February 6th.

"Q. I hand you Exhibit K; would you tell us what those are?

"A. These are the bidding documents from Martin Construction Company, Lemke Construction Company, Ben O. Davey Construction Company, and Sierra Construction Corporation.

"Q. I hand you Exhibit Number L. Could you tell us what that is?

"A. This is a letter of transmittal from Mr. McDaniel's office to Mr. Mel Moss, transferring one set of drawings for the remodeling the first floor, one set of specifications, two addenda, and one copy of bids by Martin, Lembe [sic], Sierra, and Davey, submitted on February 7, 1964.

"Q. Do you know if those were delivered?

"A. I delivered them in person.

"Q. To who [sic]?

"A. I delivered them to his secretary.

"Q. Mr. Moss's?

"A. Mr. Moss's secretary.

"Q. May I ask you what next occurred?

"A. The next was a meeting between Mr. Moss and myself and Mr. Martin.

"Q. Mr. Ted Martin?

"A. Ted Martin, to arrange the transmittal of shop drawings, submittal of rough plans for remodeling of the first floor and to lay the ground work to get the work done.

"Q. Did you have a discussion at the time with Mr. Moss?

"A. The only discussion was getting the work completed by March 10th and how to tie the job together.

"Q. What did he say with respect to architect and contracting?

"A. When we were leaving we shook hands all around, and he said, 'You're my architect; you're my contractor; get me in there by March 10, 1964.'

"Q. Mr. Moss said that to you and to Mr. Martin?

"A. Yes.

"Q. Do you know the date of that meeting?

"A. I believe it was February 11th."

The work was never commenced on the leased premises. Appellant returned the lease agreement to respondent, striking the names of President Bates and Secretary Heidrich and inserting the typed notation:

"Delivery of the above lease is rejected and signatures cancelled for the reason that parties have been unable to agree upon plans and specifications as required by terms of proposed lease agreement."

Appellant urges that a difference in the cost of the floor covering, which was estimated at the architect's original cost breakdown of January 22 (Exhibit E) in the sum of $2,280, or 76 cents per square foot, but which appeared in the plans and specifications (Exhibits H and J) at a cost of $1.95 per square foot, was excessive and not acceptable to appellant. The total original cost estimate (Exhibit E) was $14,830, without the contractor's fee, which the architect estimated during the trial to be 15–20 percent of $14,830. Since the low bid approved and accepted by appellant was $16,721, and therefore did not exceed the initial estimate, we find appellant's position untenable.

The lease agreement was signed and acknowledged by the parties. The plans and specifications were reviewed by appellant's President Bates and Secretary Heidrich. Changes were made on the plans and set forth with specificity in a letter attached which was directed to the architect and signed by Secretary Heidrich. Final plans and specifications based on Secretary Heidrich's changes were finalized and let out for bid. Bids were received and the low one approved and accepted by the appellant.

Based on the record before us, we find that it does contain evidence sufficient to support the trial judge's finding that a binding contract did come into existence between the parties and that they were bound thereby. The findings should be considered to support the judgment. Edmonds v. Perry, 62 Nev. 41, 140 P.2d 566 (1943). The finding of the trial judge in

this case is supported by substantial evidence. LeMon v. Landers, 81 Nev. 329, 402 P.2d 648 (1965); Bird v. Mason, 77 Nev. 460, 366 P.2d 338 (1961).

Respondent cross-appeals from the trial judge's decision denying any award for the improvements which appellant failed to install on the leased premises, for the reason that the appellant had the burden to prove mitigation of the damages incurred. The argument falls, for the simple reason that respondent failed in the first instance to prove any damages in this area, and therefore there was no duty on appellant to prove mitigation.

Respondent urges that the trial judge erred in not allowing respondent interest on the rental award granted. We held in Paradise Homes v. Central Surety, 84 Nev. 109, 437 P.2d 78 (1968), that three items must be determined, to enable the trial court to make an appropriate award of interest: (1) the rate of interest, (2) the time when it commences to run, and (3) the amount of money to which the rate of interest must be applied.

Since the trial judge's award of $16,050 represented the entire annual rental, payable in 12 monthly installments of $1,337.50 commencing on the 15th day of March 1964 and on the 15th day of each following month, interest at 7 percent per annum should have been allowed on each monthly installment as it became due and that total sum added to the $16,050 damage award granted respondent.

The judgment is affirmed as modified.

THOMPSON, C. J., COLLINS, ZENOFF, and BATJER, JJ., concur.