AMERICAN MFG. CO. *et al. v.* CRESCENT DRUG CO.

[73 South. 883, Division A.]

1. CONTRACTS. *Illegality. Voting contest.*
    The courts will not enforce a contract which is simply one by
    which a merchant was to obtain by means of false pretenses the
    co-operation of would-be contestants and their friends in selling
    his goods, since such a contract is within the condemnation of
    the rule that any agreement entered into between two or more
    persons to wrong or defraud a third party is illegal and unen-
    forceable.

2. CONTRACTS. *Illegality. Admission of legality by parties. Effect.*
    The courts in declining to enforce an illegal contract are not in-
    fluenced by the wishes of the parties thereto, but are governed
    exclusively by reasons of public policy.

APPEAL from the chancery court of Monroe county.
HON. A. J. MCINTYRE, Chancellor.

Suit by the Crescent Drug Company, against the Ameri-
can Manufacturing Company and others. From a decree
for complainant, defendant appeals.

The facts are fully stated in the opinion of the court.

*Wiley H. Clifton,* for appellant.

*W. D. & J. R. Anderson* and *C. P. Long,* for appellee.

SMITH, C. J., delivered the opinion of the court.

This is a suit instituted by appellee upon the guaranty
contained in a contract entered into by it with appellant
American Manufacturing Company, in which there was a
decree in accordance with the prayer of appellee's bill.

It appears from the pleadings and evidence that appel-
lee, a corporation doing a retail drug business in the town
of Amory, entered into a written contract with the Ameri-
can Manufacturing Company by which it purchased from
that company an automobile, sixteen dinner sets, and cer-

tain advertising matter, to be given away for the purpose of increasing its trade, in a voting contest to be conducted by it in accordance with the rules or instructions promulgated therefor by the American Manufacturing Company. This contest not having resulted in the expected increase of appellee's trade, it instituted this suit to enforce the following clause in its contract with the manufacturing company:

"Our (referring to appellee) sales from June 1, 1910, to June 1, 1911, were eleven thousand five hundred dollars. Our sales from June 15, 1912, to February 15, 1913, are to be twenty-five thousand dollars. If seven and one-fifth per cent. of our gross sales for the next eight months does not amount to one thousand eight hundred dollars, you (referring to the American Manufacturing Company) will pay us the deficit in cash at the rate of thirteen and one-third cents on each dollar you fall short, and send us your bond for one thousand eight hundred dollars to cover this agreement with us."

The automobile, leaving out of view the dinner sets, was to be given at the end of the contest period to the contestant receiving the highest number of votes. The rules covering the contest, among other things, provide that, within two weeks after receipt of the automobile, appellee should nominate at least one hundred and fifty contestants notifying each by letter, giving to each a number, and entering his or her name and number in the contest register, these nominations to be made without consulting the nominees, and, in event any of them should "inquire who it was that nominated them," appellee was to explain that it did not know, "for any one can make a nomination without leaving their own name." Each cent of merchandise purchased from appellee entitled the purchaser to one vote. On the 1st and 15th of each month these votes could be cast for any one of the contestants; the number of votes cast for each contestant to be on those dates entered to his or her credit in the contest register, and the standing of each contestant to be then published. At the beginning

of the contest each contestant was to be credited with a certain number of fictitious or "credit" votes; the fact that these votes were fictitious being withheld from them. In the language of the book of instructions:

"The instructions now to follow are of the utmost importance. If the vote polled the first week has not exceeded more than five thousand or six thousand per contestant, then credit all contestants who have not recorded any votes with various amounts, ranging from one hundred to one thousand, being very careful to place a small 'c' in front of them. These 'c' votes indicate 'credit' votes. These 'c' or credit votes, are used not only for the purpose of keeping all of your contestants active, but it prevents anyone, or several contestants, from forging too far ahead. These 'c' votes are only loaned to the contestant, for at the end of. the fifth month of the contest you look through your book very carefully and ascertain which contestant has received the largest amount of 'c' votes (which are indicated in your book). After finding which number has the largest amount, you give every contestant a sufficient amount of 'c' votes to bring them up equal with the highest, or, in other words you give every contestant an equal amount, so that every one of them will then stand on an equal footing.

"Explanation.

"Every contestant has received two thousand votes when starting.

"First Week.

"No. 1 records two thousand five hundred votes, making a total of four thousand five hundred. No. 2 records three thousand two hundred, making a total of five thousand two hundred. No 3 records one thousand seven hundred, making a total of three thousand seven hundred. No. 4 records no votes at all, but we give No. 4 one thousand two hundred and fifty credit votes, marking a small 'c' in space for that purpose. This gives No. 4 a total of three thousand two hundred and fifty votes.

"Second Week.

"No. 1 records one thousand five hundred, making a total of six thousand. No. 2 records nine hundred, making a total of six thousand one hundred. No. 3 records one thousand two hundred, making a total of four thousand nine hundred. No. 4 again fails to record any votes, but we give No. 4 seven hundred and fifty votes, making a small 'c' in space for that purpose. This gives No. 4 a total of four thousand.

"Third Week.

"No. 1 records one thousand, two hundred. No 2 records two thousand three hundred and fifty. No. 3 records fifteen thousand, three hundred, and No. 4 no votes at all. As No. 3 recorded a heavy vote, it would not do to let No. 1 and No. 2 fall too far behind, so we give No. 1 three thousand one hundred and fifty credit votes, making a grand total of ten thousand, three hundred and fifty. We give No. 2 three thousand one hundred and ten credit votes, making a grand total of eleven thousand, five hundred and sixty, and we give No. 4 five thousand, eight hundred and ten credit votes, making a total of nine thousand eight hundred and ten. Result: No. 1 and 2 are greatly encouraged when they note their standing, being under the impression, of course, that their friends have cast the extra votes. No. 4, who up to this time had been taking no interest, cannot longer resist the temptation to come to our store and find out who has been casting votes for him or her. We explain that we cannot say who has been voting for him or her, as we have so many people who leave their votes for various contestants that it would be next to impossible to remember who records votes for various contestants, but if he or she has so many votes to their credit without any effort on their part there certainly is a good chance to go among the leaders, if they will ask a few more of their friends to trade at your store. You will find an average of seventy-five per cent. of the people who at first would not be interested will begin to show activity.

''So by this method we do three important things : First, we make the active contestant work harder to stay among the leaders; second, we prevent those contestants who are not so active from becoming discouraged; third, we make people who at first are not interested in our contest become live, active contestants.''

During or at the end of the fourth week a letter was to be written to each contestant, stating, among other things, that:

''You are getting quite a number of votes in our contest, and we are pleased to note that your number is well up among the leaders. It is what your friends purchase that increases your standing in this contest, and we are pleased to see that you are interesting quite a number of them.''

''If the vote cast on the third recording day (in the language of the book of rules) has not been heavy, then credit all contestants with enough 'c' votes to bring them within fifteen thousand of the leader. By this we mean that you must give those contestants who have only brought in a small amount of votes an additional 'credit' vote, and you must also give those contestants who have recorded no votes at all various amounts of 'c' votes. (See sample 'How the book is kept.')

''In publishing the standing of the contestants, total up all and give credit votes to keep all contestants within twenty-five thousand  to thirty thousand of the leader.''

In a letter written by the American Manufacturing Company to appellee in explanation of its book of instructions appears the following:

''If at the end of the fourth or fifth week you have a contestant who is not credited with any except the complimentary votes, write her a letter stating that her friends have brought in so many votes for her, and that if she does not get busy herself you will have to drop her name from the contest and  substitute some one else.''

At the end of the tenth week those contestants who had received only "c" votes and could not be spurred into activity were to be dropped and other contestants substituted in their places, the book of instructions setting forth that:

"You will find it a very easy matter to approach any one who comes into your store (who is not in the contest) and tell them that (so many) votes have been cast for No. ——, and if they wish to enter the contest, you will give them that number, and also give them credit for the total amount of votes that have been cast for that number. The result will be that an average of nine out of ten people will enter the contest willingly, whereas, if they had only received two thousand votes, you could not interest them, because the other contestants are already too far ahead."

These votes, it will be remembred, were to be wholly fictitious, though that fact was not to be disclosed to the new contestants. The book of instructions further sets forth that:

"As previously stated, hold your contestants within fifteen thousand of each other by giving them credit votes, to the end of the sixth week; then you can let them vary to thirty thousand to the end of the third month; then a variance of thirty thousand to seventy-five thousand to the end of the fifth month; after that let every contestant run on his own merits. At the end of the fifth month you look through your book very carefully and ascertain which contestant has been given the largest number of credit votes, which are indicated by the small 'c,' and you give every contestant enough to bring their credit votes up to an equal amount."

One of appellants' defenses to the suit is that appellee failed to give the inactive contestants the number of fictitious votes required by the rules. Appellee admits that it did not comply with this rule, one of its excuses therefor being that, in a community as small as the one in which its business was conducted, to give such contestants the number of fictitious votes required by the rules would

arouse the suspicion of both the contestants and the public. In the testimony of its manager appears the following:

"Our town is not large, about two thousand people, and in a business of this kind everybody has their eyes on it, and  especially the contestants, and if you go ahead and give contestant fifteen, say forty thousand or sixty thousand votes, or probably two or three times that many votes, the outside public  or other contestants can readily see you were not doing that much business.  I gave them just as many votes as I thought they could stand and did it in a systematic way. . . .  I had to use some practical judgment in handling the matter.  I was on the ground and they were not.  It was not like in a place of ten thousand or fifteen thousand people where the public took no notice of things like they do in a small town.  That is the reason I did not give any more complimentary votes than I did.  Q. State whether or not, in your judgment, it would have been wise to have given any more complimentary votes than you did under the circumstances.  A. I do not think so; I gave every one of the contestants all they could stand for without becoming suspicious."

The giving of fictitious votes to contestants, as required by this contract, was calculated and intended: First, to induce some contestants to believe, contrary to the fact, that they were being voted for by customers of appellee, and had as good a chance to win the prize as the other contestants, thereby causing them to actively assist in selling appellee's goods; second, to induce the friends of such contestants to purchase goods from appellee in order to vote for them, under the belief, contrary to the fact, that their chances of winning the prize were good; third, to induce contestants who were leading in fact, because of the receipt by them of real votes, to believe, contrary to the fact, that their chances for winning the prize were endangered, thereby causing them to put forth greater efforts in assisting appellee to sell its goods; fourth, to induce the friends of such contestants to purchase goods from appellee in order to vote for them, under the belief,

contrary to the fact, that their chances for winning the prize were endangered.

In short, the scheme provided by the contract sued on is simply one by which appellee was to obtain by means of false pretenses the co-operation of would-be contestants. and their friends in selling its goods. Consequently the contract is within the condemnation of the rule that any agreement entered into between two or more persons to wrong or defraud a third is illegal and unenforceable.

It is true that appellants do not defend on this ground, but, on the contrary, expressly admit that the contract sued on is legal. Courts, however, in declining to enforce illegal contracts are not influenced by the wishes of the parties thereto, but are governed exclusively by reasons of public policy.

*Reversed, and bill dismissed.*