PLAZA AMUSEMENT CO. *et al. v.* ROTHENBERG *et al.*

(In Banc. Dec. 15, 1930. Suggestion of Error Overruled Feb. 16, 1931.)

[131 So. 350. No. 28348.]

Green, Green & Potter; of Jackson, Reily & Parker, J. H. Currie, all of Meridian, and Chas. Rosen, of New Orleans, La., for appellants.

J. H. **Currie**, of Meridian, for appellants.

812

**Reily & Parker,** of Meridian, for appellants.

Amis, Dunn & Snow and Bozeman & Cameron, of Meridian, for appellees.

820

Argued orally by **J. H. Currie, Marion W. Riley,** and **Garner W. Green,** for appellant and **A. B. Amis,** for appellees.

**Ethridge, P. J.,** delivered the opinion of the court.

The appellants were defendants in the court below, and the appellees were plaintiffs there. On July 12, 1923, the plaintiffs entered into a contract with the defendants leasing them certain property in the city of Meridian known as the Grand Opera House and the Star Theater for a term of twenty-five years, taking notes therefor payable one thousand dollars each month during the period of said lease, which was to begin on the 1st day of September, 1923, and terminate on the 1st day of September, 1948.

The defendants took possession of the leased property and operated same until the month of October, 1927, when they closed the Grand Opera House and refused to pay

the notes for December, 1927, and for January, February, March, April, and May, 1928, whereupon suit was brought by the plaintiffs upon said six promissory notes of one thousand dollars each for said months, the notes having been protested for nonpayment. The contract sued upon provides as follows:

"For and in consideration of the rental hereinafter agreed to be paid, said lessors hereby demise and lease unto said lessee, for the period of twenty-five years, beginning on September 1st, 1923, and terminating on September 1st, 1948, the following described property situated in the City of Meridian, State of Mississippi (describing it) together with the rear of the adjoining building of said Grand Opera House, and use of the elevator of said Grand Opera House, and entrances, and all of the equipment contained in said theatres and in the rear storeroom of the adjoining building of said Grand Opera House. As rental for the property so demised and leased, the said lessee agrees to pay to said lessors the sum of One Thousand Dollars per month, payable in advance, that is to say, beginning September 1st, 1923, to evidence which the said lessee has made and executed its three hundred rent notes, each for the sum of One Thousand Dollars dated this day, payable to said lessors, the first of said notes being payable on September 1st, 1923, and the others each and every succeeding month thereafter respectively, with interest at the rate of six per cent. per annum from their maturity until paid, payable at the Whitney Central National Bank of New Orleans, Louisiana, and which notes have been delivered to said lessors, receipt of which they hereby acknowledge. As further consideration for said rental agreed to be paid by said lessee, the said lessors bind and obligate themselves to furnish heat sufficient to heat said Grand Opera House during the life of this lease. It is agreed and understand that no repairs shall be made by the

lessors, except to the roof, and that the lessee shall keep the said leased premises in good order and condition as received, during the term of the lease, and return the leased property at the expiration of the said lease to the lessors in like good order and condition, wear and tear excepted. It is agreed and understood that in the event of a partial destruction of said premises, the lessors shall restore the same without delay, and to the extent that the use or occupancy of the premises is interfered with by such partial destruction by fire or other casualty, the rent shall be abated proportionately, and rent notes returned to the extent thereof. In case of the total destruction by fire or other casualty, or such destruction as to render the premises unfit for occupancy or use as a theater, if such destruction shall occur within ten years from September 1, 1923, the lessors bind and obligate themselves to restore the premises so destroyed without delay, the rent during the period of which the lessee is deprived of the use or occupancy to be abated proportionately and the rent notes therefor to that extent returned, and should the lessors fail without unnecessary delay to restore the said premises so destroyed and so notify the lessee of their intention to restore the same within thirty days after such destruction, the lessors bind and obligate themselves to restore to the lessee all of the notes for the unexpired portion of said lease. It is understood that for the purposes aforesaid, the monthly rental of the two properties leased shall be apportioned as follows, One Hundred Fifty and no/100 Dollars for the Star Theatre, and Eight Hundred Fifty and no/100 Dollars for the Grand Opera House. It is further understood and agreed that the leased premises shall be delivered to the lessee by the lessors in substantially their present condition on September 1st, 1923.''

The contract then provides that, should there be a total destruction of the leased premises ten years or more from

September 1, 1923, the lessors should not be obligated to restore the same, but should notify the lessees within thirty days whether or not they elect to restore the premises, and to abate the rent during the period of building while the lessee is deprived of the use of said building, and, should the lessors elect not to restore the building, to return all the notes for the unexpired portion of the rent to the lessees. The contract also provided for a quiet and uninterrupted possession of said premises by said lessees during the period of said lease.

On the 17th day of July, 1923, a supplemental contract was entered into by and between the parties to this suit by which it was provided that there were omitted from the original agreement the provisions set forth, and which were desired to be included in said agreement as a part thereof, and which contract was executed to make a part of said lease, and which provided that:

"1. It is understood and agreed that the intent and meaning of the agreement in said lease about the total destruction of the Star Theater shall not interfere with the use of the Grand Opera House, and the destruction of the Grand Opera House shall not interfere with the use of the Star Theater; but each is to be regarded as a separate property under the lease.

"2. It is agreed that said property and premises so leased shall be used for theatrical purposes only, and cannot be used for any other purpose without written consent of owners of the property."

On the 12th day of July, 1923, there was entered into by the parties to this suit another supplemental agreement the provisions of which were as follows:

"Whereas, parties of the first part have this day leased to party of the second part the property known as the Grand Opera House and the Star Theater, at Meridian, Mississippi, for a term of twenty-five years, beginning

September 1st, 1923, at a monthly rental of One Thousand Dollars per month, now the parties hereto do hereby declare as follows:

"1. As an additional consideration for the execution of said lease, said party of the second part has agreed to pay to the parties of the first part, the additional sum of Twenty-five Thousand Dollars, and in payment thereof has executed and delivered to the parties of the first part its twenty-five promissory notes each for the sum of $1,000.00 payable to the order of the parties of the first part, dated this day, and payable on or before September 1st, 1924, and on or before the 1st of September of each succeeding year thereafter, respectively, with interest at the rate of six per cent. per annum from September 1st, 1923, interest payable annually, payable at the Whitney Central National Bank, La., receipt of which notes is hereby acknowledged by said parties of the first part.

"2. The said Saenger Amusement Company, Inc., being interested in the said Plaza Amusement Company, has endorsed all of the said rent notes covering the rental of said premises and all of the twenty-five notes referred to in this agreement, and does hereby bind and obligate itself jointly and severally with the Plaza Amusement Company to the full payment thereof and to all the other terms, conditions and obligations of the said lease.

"3. It is distinctly understood and agreed by the lessors of the said leased premises that in case of the total destruction of said Grand Opera House within ten years from September 1st, 1923, and the refusal or failure of the said lessors to re-construct the same as provided in said lease, then the lessors, in addition to the return of the rent notes for the unexpired portion of the lease shall return to the lessee, the notes hereinabove recited aggregating Twenty-five thousand dollars, for the unexpired portion of said lease.

"4. It is distinctly understood and agreed that the lessors' transfer, as part of the consideration of this agreement, the good will, custom and patronage of both of said theaters, and do agree, each of them, not to engage, during the life of said lease, in the City of Meridian, Miss., directly or indirectly, whether as owner, partner, stockholder, or otherwise, in the moving picture or theatrical business."

The plaintiffs declared upon the contracts above set out in their original declaration, making the notes sued upon exhibits to the declaration, and demand judgment for the amount of said notes.

Thereafter they filed an amended declaration in which they declared upon the notes, setting forth the original contract without the supplemental contracts.

The notes were all in the form of No. 52, which reads as follows:

"$1,000.00 · New Orleans, La., July 12, 1923

"On December 1st, 1927 we promise to pay to Levi Rothenberg—Marks Rothenberg—Sam Rothenberg, estate I Marks by I. E. Marks, Executor, One Thousand Dollars Value to be received in rent for the month of January, 1928, with interest at the rate of six per cent per annum from maturity until paid. Payable at Whitney Central National Bank.

"Plaza Amusement Co.

"J. H. Saenger, Pres."

Indorsed: "Saenger Amusement Co., Inc., J. H. Saenger, Pres., Levi Marks and Sam Rothenberg, Estate of I. Marks, by I. E. Marks, Executor."

The defendants plead the general issue and numerous special pleas. The pleadings are too lengthy to be set out, but they set forth in great detail that the Grand Opera House was not properly constructed in accordance with the statute and ordinances of the city of Meridian, setting out with particularity numerous de-

fects claimed to exist in said building, and stating that it was not a suitable building for the purpose for which it was leased and that it was illegal to conduct a show within such building, and that the contract was void because of such illegality.

The defendants also set forth the supplemental agreements, alleging that, by reason of such agreements, the building should be used only for a theatrical and picture show business, and, not being suitable for that purpose, and not conforming to the statutes and city ordinances, made it unlawful for the parties (lessees) to operate a theater or picture show, and that the contract was therefore illegal, and that the agreement of the lessees not to engage in the picture show business during the life of the lease was violative of public policy and statutes of the state, and rendered the entire contract illegal. The defendants also undertook by plea, to tender into court the amount provided in the contract for the Star Theater during the time involved in the suit up to the time of the trial, but did not appear to have paid any money into court or tender any check with said plea.

There were demurrers to some pleas and replications to others, and the matter came to issue and proceeded to trial, at the conclusion of which the circuit judge granted a peremptory instruction for the plaintiffs, upon which judgment was entered, and, from this judgment in favor of the plaintiffs, this appeal is prosecuted.

It is not necessary to set forth the facts in detail. There was proof on the part of the defendants that the Grand Opera House was not safe, that it was dangerous to conduct a picture show or theater in the building, and, if this case depended upon the question whether the Grand Opera House was a safe building in which to conduct a theater or picture show, it would be a question for the jury because there is a conflict in the evidence upon that question. It appeared, however, from all the testimony,

that the Grand Opera House could be made a safe building in which to conduct a picture show or theater by certain repairs, including certain stairways to be placed therein, and that it would not take a very considerable expense to make said Grand Opera House a safe place in which to conduct a business such as that for which it was leased.

It appears from the testimony that the main entrance to the Grand Opera House was from Fifth street in the city of Meridian, said opera house being situated in buildings owned by the plaintiffs and between their main store building and office buildings owned by them, and that the building in which the Grand Opera House exists extends from Fifth street on the south to Sixth street on the north, and the entire block between said streets, and between Twenty-second Avenue and Twenty-third Avenue is occupied by buildings owned and occupied by the plaintiffs, except on the west end of said block and fronting on Twenty-third Avenue and Fifth and Sixth streets is the Great Southern Hotel building in said city. It also appears that the main entrance to said opera house extends by a broad stairway to the second floor through a passageway some six and one-half feet wide to the auditorium of said Grand Opera House, and from the main floor of the opera house stairways reach the balconies from either side, and from the balconies to the galleries on either side.

It further appears that there is an exit upon each floor into the office buildings owned by the lessors (plaintiffs), and that a stairway leads from these office buildings towards Fifth street, and that these exits have been constantly used as such by the public since the construction of the Grand Opera House in 1890 until it was closed in October, 1927.

It also further appears that there is an exit leading to Sixth street from the rear of the stage which is used by

the theater people and employees as an exit in reaching the street, and there is another passageway under the stage leading to Sixth street which is obstructed in such nature that persons going through it must go in a stooping position.

It is shown in the testimony for the defendants that two stairways on the east of said building leading into Fifth street and Sixth street should be made, and that to make these stairways they would have to pass through the storeroom of the department store of the plaintiffs, and also there should be an additional stairway on the west side of said building, and that it would be necessary to make an opening on this west side to Sixth street to make this exit effective. It was also shown in the evidence that there were insufficient passage aisles in certain parts of the building but that these could be made sufficient at a very small expense by removing some chairs. It was also contended by the defendants that there should be certain fire escapes placed on the building to comply with the city ordinances, and that no such fire escapes had ever been placed.

It appears that the building is equipped with the sprinkler system, as were all the office buildings lying to the west of the Grand Opera House, and that certain fire plugs are situated in the building connected with the city waterworks, and that the building is equipped with a large water tank owned by plaintiffs, situated on top of the Marks-Rothenberg building and connected with the fire apparatus. It also appears that the building is equipped with certain chemical fire extinguishers at appropriate places therein.

We think the main question for determination in this suit and the controlling one is whether the law of Louisiana or the law of Mississippi applies. Under the law of Louisiana, lessors are held to warrant that a building is fit for use for which it is leased, and, if this

law applies, this case would have to be reversed and the case submitted to a jury. As shown by the contract and notes set out above, the notes were payable in the state of Louisiana, being dated "New Orleans, Louisiana, July 12, 1923," but the lease is of property situated in the state of Mississippi, and the lease is the consideration for the notes. The operation of the picture shows was necessarily in Meridian, Mississippi, and the carrying out of the lease is, we think, controlled by the law of Mississippi, and that law governs the transaction throughout.

In the case of M. Levy & Sons et al. v. Jeffords, 141 Miss. 818, 105 So. 1, 2, there was a note involved payable in Louisiana, but secured by a mortgage on lands in the state of Mississippi, and it was there contended that the law of Louisiana controlled. In the course of its opinion the court said: "Undoubtedly the general rule is that where a note is executed in one state and made due and payable in another, the rights and obligations of the parties are governed by the laws of the state where the note is payable. But that is not true of notes of the character of those involved in this cause. Notes alone did not constitute the entire contract between the parties here. They were renewed annually for balances, and mortgages were taken on lands and other property in this state, as stated, to secure such balances, as well as advances to be made during the current year. Execution of the notes and mortgages were parts of one and the same transaction. There was no intention of the parties that the execution of the notes should be separate transactions from the execution of the mortgages. They constituted one contract, not two contracts. In case of foreclosure of the mortgages, either through the courts or by sale in pais, it had to be done here and under the laws of this state. The cotton to be raised on appellee's plantation and shipped to appellants M. Levy & Sons

under the stipulation in the mortgages was to be raised in this state. The money advanced appellee by appellants was for the purpose of carrying on his farming interests in this state. In other words, the larger part of the contract, in fact all of it except the mere place of the payment of the money, was to be performed in this state and not in Louisiana. We hold that under the facts of this case the question of usury was governed by the Laws of Mississippi and not Louisiana. Meroney v. Atlanta Bldg. & Loan Ass'n, 116 N. C. 882, 21 S. E. 924, 47 Am. St. Rep. 848; Jackson v. American Mortgage Co., 88 Ga. 756, 15 S. E. 812; Building & Loan Ass'n v. Griffin, 90 Tex. 480, 39 S. W. 656; Fidelity Savings Association v. Shea, 6 Idaho, 405, 55 P. 1022; Thompson v. Edwards, 85 Ind. 414; Wharton on Conflict of Laws, sections 504-510; Building & Loan Ass'n v. Brahan, 80 Miss. 418, 31 So. 840 [57 L. R. A. 793]."

In this last case it was held that, where a foreign building and loan association, having no office or agent in Mississippi, lends money to a stockholder resident in Mississippi, secured by a deed of trust on lands there located, it is, in effect, a Mississippi contract, and will be governed by the usury laws of that state when it appears that the association has special agents in various towns throughout the state with authority to solicit subscriptions for stock, take applications for loans and receive payment of dues, interest and premiums, although the terms of the contract provide that payments shall be made in a foreign state.

The main contract in the case at bar, the purpose for which the notes were given, was for the operation of picture shows and theatrical shows in a building situated in the state of Mississippi, and we think the cases cited above are controlling, and that the law of Mississippi controls the rights of the parties in this suit.

Under the law of Mississippi the lessors, in executing the lease, in the absence of express covenant, did not im-

ply a covenant that said lessors would make repairs, nor was there any implication on their part that the premises were suitable for the lessees' business.

See Jones v. Millsaps, 71 Miss. 10, 14 So. 440, 23 L. R. A. 155, in which the court held that, in the absence of deceit in making a contract, and where there is no express covenant to repair, the lessor of a lower story of a building is not liable for damages sustained by the lessee because of a leak from above, although the lessor maintains the premises and fails to repair the roof. In the course of its opinion in dealing with this question, the court said:

"We come now to the consideration of the real contention between the parties, presented in the last special cause of demurrer, and that is, to state it fairly and fully: Can the lessor, in this particular case of the leasing of the lower story to the plaintiff, with retention of the upper story in his own possession and use, be held liable for necessary repairs, in the absence of any covenants to keep in repair imposed upon him by the written contract of lease, and in the absence of deceit, misrepresentation, or fraud? The general rule that a landlord, in the absence of express covenants in the contract of lease, and in the absence of deceit or misrepresentation, cannot be held liable on any implied warranty on his part for repairs, is not called in controversy by counsel for appellant, as we understand his argument. The correctness and the universality of the rule as stated are admitted; but the lease of a lower story by a landlord retaining the other parts of the building in his own possession and use presents a case exceptional to the general rule, it is contended. This position rests, as it appears to us, upon one of two grounds: (1) Either upon an implied covenant for repairs on the lessor's part, springing out of the written contract itself; or (2) upon the relationship of the parties to each other and to the leased premises. The subject is not free from difficulty, nor is

there wanting eminent authority for both of the grounds just mentioned, of fixing liability upon the lessor. . . . The first proposition is to fix liability for repairs upon the lessor, in the absence of any express covenants in the written contract of lease, on an implied covenant growing out of the lessee's express covenants to repair the leased storeroom. In the case at bar there are two ready answers to the contention: (1) The repairs and alterations covenanted for by the lessee are not to be supposed to refer to repairs of ordinary wear and tear. These were imposed by law, and needed no sanctions of covenant. They are, as is plainly to be seen in the contract, covenants for extraordinary repairs or alterations, to be made for the peculiar accommodation of the lessees' business. And, (2) conclusively, to raise this implied covenant to repair by the lessor would be to introduce into the written contract of the parties a most important condition which they did not incorporate in it themselves when they reduced their agreement to writing. It would amount to an essential modification by parol of a written contract. It would be, not the explanation by parol of an obscurity on the face of the contract, but the substitution of one contract for another,—a contract by parol for the written one made by the parties. . . . The other ground of contention, viz. the liability for repairs on the part of the lessor in cases where a part, only, of the premises are leased, and the remainder retained by the landlord, because of the relationship of the parties to each other and to the property, seems to be clearly recognized in the case of Toole v. Beckett, 67 Me. 544 [24 Am. Rep. 54]. The decision and its reasoning are not satisfactory, and the vice of the opinion is that it confounds the passivity of the landlord with affirmative action on his part amounting to negligence. It overlooks the fundamental principle in all leases by which the lessor is made to 'hand off' during the continuance of

the lease. He may not be required to affirmatively aid the tenant in repairs, and he may not affirmatively act inconsistently with his lessee's right to possession and enjoyment; and, so long as the lessor abstains from all action, he is within the line of his duty. The Maine case confounds negligence with nonintervention, and is unsound.''

See, also, to the same effect Green v. Long, 152 Miss. 117, 118 So. 705, and 36 C. J. 45, section 660, where it is said that: ''There is, as a general rule, no implied covenant upon the part of the landlord that the demised premises are fit for the purposes for which they are rented, or for the particular use for which they are intended by the tenant, or that they shall continue fit for the purpose for which they were demised, and this is true, although the landlord knows the purpose for which the tenant intends to use the premises.''

In the same volume, page 84, section 710, it is said: ''Where the contract of lease is silent on the subject, the lessees have by implication the right to put the premises to such use and employment as they please, not materially different from that in which they are usually employed, to which they are adapted, and for which they were constructed. The law implies an obligation on the part of the tenant to use the property in a proper and tenant-like manner, not to put it to a use or employment materially different from that in which it is usually employed, or inconsistent with those uses to which it is adapted or for which it is constructed, or apparently violative of the spirit and purpose of the lease, as such spirit and purpose are evidenced by the recitals therein, not to use the leased property so as to bring injury to the landlord, and not to expose the buildings to ruin or waste by acts of omission or commission.''

In the same volume, at page 125, section 766, under the head of ''Repairs,'' etc., it is said that: ''At common law,

in the absence of statute, or of express covenant or stipulation in the lease, the lessor is not bound to make ordinary repairs to the leased property, especially where the defects complained of were apparent and easily discovered when the lease was entered into, nor is he bound to pay for such repairs made by the tenant. The tendency of modern decisions is not to imply covenants, which might and ought to have been expressed, if intended, and a covenant is ordinarily not implied that the lessor will make any repairs to the demised premises, even to remedy defects in the demised premises existing at the time of the demise. The rule of caveat emptor applies as to contracts of lease or hire generally.''

At page 142 of the same volume, section 781, under the head of ''Repairs Required by Law or Public Authorities,'' it is said: ''A covenant by the tenant to make necessary repairs includes repairs required by the public authorities, although it does not include a change in the condition of the premises which is not technically a repair, nor an order to rebuild, but it may require him to replace walls or parts thereof condemned by public authorities. Covenants specially requiring the tenant to comply with the orders of civil authorities are binding on the tenant as to repairs or alterations included within their provisions by a proper construction thereof.''

On page 93 of the same volume, section 729, under the head of ''Duty of Landlord to Permit Use,'' it is said: ''Where property is leased for a particular use, the lessor is bound to interpose no legal obstacles to such use. The purpose for which premises are leased when expressly recited in the lease, followed by the actual occupation of the premises for that purpose, estops the landlord and those claiming under him, from acts defeating such purpose. He is not, however, bound to authorize such use by another than the tenant.''

From these authorities, it will be seen that the lessors were not under duty to place the Grand Opera House in a suitable condition for the uses of the lessees. It was expressly stipulated in the contract that the lessors were not to make any repairs except to the roof. In view of this stipulation that the lessors were not to make any repairs, each of the parties contracted, in effect, that the lessees took the property as it was, with the right to put it in a suitable condition for the uses for which it was intended, at their own expense. The lessees, as well as the lessors, are charged with notice of statutes and ordinances, and, where a building is not in condition to comply with such ordinances or statutes, and the contract does not prohibit the lessees from making the building suitable for the purpose for which they leased it, they may make it suitable. It was not unlawful to lease the building for theatrical or picture show purposes in a condition that did not conform to the statute or ordinances. The lessees had a right to lease the building for such purposes and put it in proper condition at their own expense.

In 18 C. J. 294, section 272, under the head of "Appurtenances, Incidents, and Rights Passing with Deed," it was said: "It is a general rule that upon the conveyance of property the law implies a grant of all the incidents rightfully belonging to it at the time of conveyance, and which are essential to the full and perfect enjoyment of the property. And a similar rule obtains in the case of property which is reserved or excepted in a deed. The appurtenances which pass are not limited to such as are absolutely necessary to the enjoyment of the property conveyed, but include such as are necessary to the full enjoyment thereof."

In 8 R. C. L. 1068, section 123, under the head of "Incidents and Appurtenances," it is said: "Generally, everything is deemed to pass which is necessary to the

proper use of the property conveyed. The words, 'privileges and appurtenances' are, therefore unnecessary in a deed, the inference being that the grant of the land carries with it the appurtenances unless the contrary is provided, and not that the appurtenances do not follow the land unless the deed so recites.''

At page 1115, section 177, it is said: ''Restrictive covenants as such are treated elsewhere, but it seems proper to treat of them in their relation to the right to the use and enjoyment of the property conveyed. The rule is that conditions and restrictions inserted in a deed will be upheld, so long as the beneficial enjoyment of the estate is not materially impaired. Accordingly it is held that a condition imposing an obligation to build or maintain a fence is valid.''

See, also, Board Supervisors, Lamar County, v. Elliott, 107 Miss. 841, 66 So. 203; Davis v. Fortenberry, 114 Miss. 294, 75 So. 119; Bonelli v. Blakemore, 66 Miss. 136, 5 So. 228, 14 Am. St. Rep. 550; Powers v. Heffernan, 233 Ill. 597, 84 N. E. 661, 16 L. R. A. (N. S.) 523, 122 Am. St. Rep. 199.

In Burdick on Real Property, p. 410, it is said that ''covenants in deeds may also operate as grants of easements.'' See, also, Pratt v. Electric Company, 182 Mass. 180, 65 N. E. 63; Lumiansky v. Tessier, 213 Mass. 182, 99 N. E. 1051, Ann. Cas. 1913E, 1049.

The proof shows, without dispute, that, whether the building was in repair or not, or whether it complied with the statute and ordinances or not, it could be put in condition without unreasonable expense. All of the witnesses agreed that this is true. Lumiansky v. Tessier, supra, and Powers v. Heffernan, 233 Ill. 597, 84 N. E. 661, 16 L. R. A. (N. S.) 523, 122 Am. St. Rep. 199, and case note on page 206.

It is said, however, that the lessees are not required to make repairs involving a structural change. This may

be conceded, and it might be conceded, furthermore, although we do not think the record so shows, but on the contrary shows that it can be put in condition at small expense, that the building could be put in suitable condition without a structural change.

If the subject-matter of the contract was illegal per se, it would be void. Miss. Digest, 101, 108. But, where it can be made legal by repairs or changes not involving an unusual expenditure, and the lessee is permitted to make such changes, or where the obligation to make the needed repairs is upon the lessee, as in the present case, it is the duty of the lessee to do so. The parties must be assumed to have intended the contract to have that effect, and not to have intended to violate the law. Riley's Administrators v. Vanhouten, 4 How. (Miss.) 428; Merrill v. Melchior, 30 Miss. 516; Wilkins v. Riley, 47 Miss. 306; Orrell v. Bay Mfg. Co., 87 Miss. 632, 40 So. 429.

If an illegal condition be annexed to a contract, it will not void the whole contract, but the illegal part will be treated as void. Adams v. Standard Oil Co., 97 Miss. 879, 53 So. 692.

The lessees made the contract, and, as it was not illegal to make such a contract, in our opinion, even if the building was not in a suitable condition for the purpose for which it was leased, the lessees must abide by the consequences of their contract. It may be true that the statute may prohibit the conducting of a picture show in the building in its present condition, but still, if the lessees can put it in suitable condition under the law, they must either put it in such condition, or pay the rent without the use of advantages that flow from the conducting of a picture show or theatrical business. Lumiansky v. Tessier, 213 Mass. 182, 99 N. E. 1051, Ann. Cas. 1913E, 1049, and Pratt v. Electric Co., 182 Mass. 180, 65 N. E. 63.

We do not think, however, that the making of the changes testified to as being necessary would involve a structural change within the meaning of the law upon that subject. The witnesses testified that these changes can be made without weakening the structure so as to endanger the safety of the public.

In Pross v. Excelsior Cleaning & Dyeing Co., 110 Misc. Rep. 195, 179 N. Y. S. 176, 179, a structural change is discussed, and the court there said: "What is or amounts to a structural change is not easy of definition. The term is elastic. In a sense, a fire escape or stairway is a structure; so, also, is a stepladder, a post, or a fence. By structural change, in cases of this character, I believe is meant such a change as to effect a vital and substantial portion of the premises, as would change its characteristic appearance, the fundamental purpose of its erection, or the uses contemplated, or a change of such a nature as would affect the very realty itself—extraordinary in scope and effect, or unusual in expenditure. My impression is that the erection of a fire escape does not amount to a structural or extraordinary change, or come within that category. Certainly it does not amount to a reconstruction of the building itself. Nor does it involve unusual expense."

In our opinion, neither the contract involved in the case at bar, nor the law, prohibits the appellants from placing the building in a suitable condition to comply with the law. They may make such changes as are necessary to make the lease effective, although they cannot make unusual or extraordinary changes as a mere matter of convenience, as distinguished from necessity. Powers v. Heffernan, 233 Ill. 597, 84 N. E. 661, 16 L. R. A. (N. S.) 523, 122 Am. St. Rep. 200, and case note at page 207 et seq.

We do not deem it necessary, therefore, to go into any discussion of the evidence, or to say whether, under the

statute, any change is necessary to comply with the statute, nor whether the statute is valid or constitutional. The statute is ambiguous and needs amendments, but it does not avoid the contract of lease. The theater has been used for many years in its present condition, and has been patronized by the public, but that does not necessarily mean that it complied with the law. The ordinance relied upon was not proven, but would not defeat plaintiff's right for reason given above.

But we think the statute has no bearing on this contract, because, under the evidence, the lessees could easily make it conform to the statute, if such need is existent.

As stated above, it is argued that the agreement of the lessors not to engage during the period of the lease in the picture show business in the city of Meridian violates the anti-trust law, and that this agreement is contrary to public policy and avoids the contract. We do not think so. At common law, it was not unlawful for a party to sell out his business with his good will and agree not to engage in that line of business in that locality or community. Our anti-trust laws are only intended to include within their provisions contracts which were invalid under the common law or against public policy. See Sivley v. Cramer, 105 Miss. 13, 61 So. 653, 654, in which it was said: "Contracts whereby the parties thereto, or either of them, are restrained from engaging in business, have been divided into two classes: 'First, those which are a part of a transaction involving the good will of a business, which are designed to protect such good will, and to that end to restrain some person or persons from engaging in business; and, second, those which have for their primary object, not the protection of good will, but the formation of a monopoly in a given business.' It will be observed that the contract here in question is of the first class, and what is herein said must be taken as referring alone to contracts of that character." See,

also, Cumberland Telephone Co. v. State, 100 Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277.

Meridian, Mississippi, at the time this contract was made, was a city of about twenty-five thousand inhabitants. Prior to that time, numerous picture shows had existed in the city. At the time of the making of the contract, the lessees were operating a picture show and theater in the city. There is nothing to prevent other people from engaging in such business if they should so desire. It is said that a large territory patronizes the Meridian picture shows, and that the effect of the contract therefore is to deprive the public of the benefit of competition, as the plaintiffs have been engaged in the theater business for many years, and were experienced theater people.

It is a well-known fact that most of the smaller cities and towns of considerable size have picture shows in their limits, and that numerous picture shows exist throughout the country.

There is nothing to prevent any person or corporation desiring to do so from entering into that business, and it is presumed that sufficient people, or a corporation, will do so if the business is as profitable as it is supposed to be.

It is said by the appellees that, even if this provision in the supplementary contract violates the anti-trust law, it could be separated from the main or first contract, and that could be upheld and all the notes sued on herein given under the first contract, and that it is immaterial whether the second, or supplementary, contract violated the law or not.

We do not deem it necessary to discuss this feature of the case, as, under the above authorities, the transaction did not constitute a violation of the anti-trust law.

We find no reversible error in the case, and the judgment of the court below will be affirmed.

Affirmed.

**Anderson, J.** (dissenting).

The members of the court are in agreement that the contract involved is governed by the laws of Mississippi, and not Louisiana, and also that the contract does not violate our anti-trust statute. The disagreement is among the members of the court on the other questions decided by the controlling opinion.

Section 2273, of the Code of 1906, Hemingway's Code of 1927, section 5273, provides as follows:

"5273. Every place for public amusement shall have at least the following arrangements for the safety of those attending therein: The seats shall be located in rows with spaces between the seats adequate for easy ingress and egress, and an aisle of at least four feet in width shall run between the rows on the lowest floor, if there be more than one floor, from the commencement of the seats toward the place of performance, exhibition, or speaking, as far as the seats are located, and, if there be only one floor, then between the rows on that floor, and also an aisle of at least three feet in width shall be made to run along the outward ends of the rows of seats and next to the walls, and also around or along the ends of all rows of seats wherever located; and all aisles shall be kept unobstructed towards places of egress. All seats shall be located in rows, to which the aisles shall conform. There shall be as many doors for egress for those in attendance, not less than two at either end or side of the building, as can be made consistently with the proper strength of the structure. All scenery shall be made as secure against becoming inflamed as reasonably practicable, and all reasonably practicable arrangements shall be made for the supply of water or other means for extinguishment of fires, and they shall be kept constantly effective during the presence of the audience. In cities of over ten thousand inhabitants a fireproof drop-

curtain of sufficient dimensions to cover the entire front of the stage shall be so hung that, upon an alarm of fire originating upon, or in rear of stage, it may be promptly dropped so as to prevent the fire from communicating with the auditorium.''

Section 64 of the Building Ordinance of the city of Meridian provides as follows: ''That all buildings in the city of Meridian, three stories high or more in height, not including basements, any portion of which above the second story is used as a . . . public hall . . . shall have thereon . . . suitable and substantial fire escapes.''

Section 87 of the ordinance denounces as a misdemeanor its violation, subjecting the person convicted of such misdemeanor to a fine of not more than fifty dollars every day of violation to be a separate offense.

The wisdom of our statute and the ordinance is demonstrated by the many horrible and well-known catastrophes which have occurred in theaters within the last sixty years—most of which were caused by the inadequacy of means of egress, the greater part of them were the result of fire panics. Of these catastrophes the following is a partial list:

On December 5, 1876, 295 were killed in Conway's Brooklyn Theatre; on December 18, 1881, 800 were killed in the Ring Theatre in Vienna; on May 25, 1887, 200 were killed in the Opera Comique, Paris; September 5, 1887, 75 were killed in the Exeter Theatre, New York City; April 9, 1894, 76 were killed in the Davidson Theatre, Milwaukee; February, 1897, 230 were killed in Quanton Theatre, Pekin, China; May 30, 1897, 143 were killed in the Grand Charity Bazaar, Paris; January 12, 1903, 169 were killed in Rhodes Theatre Boyerton, Va.; December 30, 1903, 602 were killed in the Iroquois Theatre, Chicago; January 28, 1922, 98 were killed in the Knickerbocker Theatre, Washington; January 9,

1927, 77 were killed in the Laurier Theatre, Montreal; May 10, 1916, 22 were killed in the Wallacetown Theatre, Virginia; November 14, 1920, 7 children were killed in Catherine St. Movie House, New York; June 25, 1925, 6 were killed in the Gillis Theatre, Kansas City.

The provisions of the contract out of which the questions decided arise are as follows: Appellees leased to appellants the ''Grand Opera House located on Fifth street . . . together with the rear of adjoining building of said opera house . . . and entrances, and all the equipment contained in the said theatre and in the rear storeroom of the adjoining building of the said Grand Opera House.'' The contract provided that there should be no repairs made by appellees except the roof, and that appellants ''shall keep the said leased premises in as good order and condition as received, during the term of the lease, and return the leased property at the expiration of the said lease to the lessor in like good order and condition, wear and tear excepted,'' and that the property leased ''shall be used for theatrical purposes only, and cannot be used for any other purpose without the written consent of the owners of the property.''

The evidence either established without conflict, or tended to establish, the following facts: One entire block in the city of Meridian is occupied by appellees' four-story brick building and the Great Southern Hotel. This block is bounded on the east by Twenty-Second avenue, on the west by Twenty-Third avenue, on the south by Fifth street, and on the north by Sixth street. Appellees' four-story building is on the east part of the block, and the Great Southern Hotel on the west part. Appellees' building, beginning east and running west, is composed of a department retail store, the Grand Opera House, and, adjoining the Grand Opera House on the west, an office building; then comes the Great Southern Hotel building.

The Grand Opera House occupies the second, third, and fourth stories of that part of the building, and appellees' department store occupies the space east of the Grand Opera House, and also the space under it. The west wall of the Grand Opera House is the partition wall between appellees' office building and the Grand Opera House. The east wall of the Grand Opera House is the partition wall between the Grand Opera House and appellees' department store building. The Grand Opera House faces south on Fifth street, its rear is north on Sixth street. The front entrance to the Grand Opera House is a doorway nine feet wide at the extreme southwest corner of the building, with a railing running up the entrance. The stairway from this empties into a lobby on the second floor, from which three flights of steps lead to the dress circle, one of which is just north of the point where the entrance stairway reaches the lobby, another in about the middle of the lobby, and the other at the extreme right of the lobby. The lobby is shaped somewhat like a jug. The only exit from the lobby to the front on Fifth street is through a space of six feet four inches. From the lobby two winding stairways three feet wide lead to the landing in the balcony. Another winding stairway leads from the lobby up to a landing on the fourth floor, which leads into the gallery. This stairway is two feet and five inches in width. The stairway in the front, on Fifth street, is the only entrance used by the public in going to the theater. This empties into the lobby, from which those attending the theater go to the dress circle, balcony, or gallery, as provided in their tickets.

The theater building does not extend to the front wall of appellees' building on Fifth street side, except on the fourth floor. Appellees retained and occupied the entire front of the ground floor, except the entrance stairway and the space between the east wall of the lobby and the

east wall of the building on the second and third floors. In front of the stage is the pit for the orchestra, at the right and left sides of the pit are exit signs, leading to an exit under the stage, which consists of a wooden stairway at the rear of the theater and under the stage, leading to Sixth street.

The building falls short of the requirements of the statute and the ordinance of the city of Meridian in more than fifty different respects. The evidence probably showed, however, that all the defects could be remedied without structural changes, at a moderate expense, except the lack of sufficient exits, and the lack of fire escapes; the former being required by the statute, and the latter by the ordinance of the city of Meridian.

It will be observed that the statute (section 5273) provides that in all places of public amusement "there shall be as many doors for egress for those in attendance, not less than two at either end or side of the building, as can be made consistently with the proper strength of the structure." The ordinance requires "suitable and substantial fire escapes."

If not without conflict, the evidence was overwhelming that there were not sufficient means of egress from the building. The only exit space that could be used with any degree of safety is the stairway four and one-half feet wide leading down through appellees' office building, and the space leading from the lobby, six feet and four inches wide, making a total exit space of one hundred thirty inches. Experts of high standing were introduced as witnesses. They all agreed, including Mr. Springer, an expert introduced by appellees, that the minimum exit space in a building of the capacity of this theatre (the seating capacity being nine hundred seventeen) is twenty inches for every one hundred of seating capacity, which would amount to an exit space of one hundred eighty-four; and therefore the exits from the

Grand Opera House aggregate fifty-four inches less than the minimum.

The evidence tended to show that the Grand Opera House was so far short of being safe for the purpose for which it was intended that in all probability, in case of a fire panic, the exits would be choked with dead and dying people.

The evidence showed that additional exits could be made consistent with the proper strength of the building; but the evidence also showed that, in order to construct additional exits, it would be necessary to go through property belonging to appellees, not leased to appellants, and that such additional exits would require structural changes, not only in the property leased, but in property belonging to appellees, not leased. The photographs in the record, in connection with the other evidence in the case, would seem to demonstrate this to be true. Of course, additional exits could not be made through the east and west walls of the opera house, because such exits would lead into the office building and the department store building belonging to appellees, not leased. The ground floor under the opera house was part of appellees retail department store, and was not leased. Additional exits could not be made at the front entrance on Fifth street without encroaching upon appellees' department store; nor at the rear, without practically destroying that part of the building, and reconstructing it, which also would necessitate an encroachment on appellees' property not leased.

In 1926 appellants made an effort, without avail, to induce appellees to agree that the Grand Opera House be remodeled, and used for some other purpose than a theater. Appellants offered evidence to show that in 1927 the building was condemned by the building inspector of the city of Meridian as unsafe and dangerous to the theater-going public, and offered to show also by

evidence that appellants' liability insurance on the building was canceled by the companies that carried it on the same ground.

Shortly before this suit was brought, appellants agreed to continue the use of the Grand Opera House as a theater, paying the monthly rentals, provided the appellees would get the building inspector of the city of Meridian to certify that it was safe to use it for that purpose. Appellees made an effort to do that, but failed; and they then claimed that the building complied with the law, and demanded that appellants continue to use it for theatrical purposes, and pay the monthly rentals according to contract. This appellant refused to do, and thereupon this suit was brought by appellees.

Appellees neither proposed to appellants that they (appellees) would make the building conform to the requirements of the law at their own expense, nor did they offer to permit appellants to do so at their expense. In short, immediately before this action was brought, the attitude of the parties was simply this: Appellees said to appellants, "We demand that you continue to conduct the theatrical business in the Grand Opera House, as provided in the contract, and pay the rentals therein provided." Appellants replied that they were perfectly willing to do so, provided it could be legally done; appellants contending that it could not be legally done, appellees that it could. In other words, appellants contended that radical structural changes were necessary in the building to make it conform to the law, and appellees contended that no changes whatever were necessary, and that it already conformed to the law.

The majority opinion solves the questions involved upon the following principles: That there was no implied covenant on the part of the lessors to make repairs of the leased premises; nor was there an implied covenant on the part of the lessors that the leased premises

were suitable for the purposes for which they were leased; that there was no implied covenant on the part of the lessors that the demised premises were fit for the purpose for which they were leased, or that they should continue fit for such use; that, where a lease contract is silent on the subject, the lessee has the right to put the leased premises in suitable condition for the purpose for which they were leased, and the lessee must do so at his own expense, unless there is an express provision in the lease to the contrary, and this is true, although it involves structural changes in the leased premises.

To sustain these principles, the majority opinion cites Jones v. Millsaps, 71 Miss. 10, 14 So. 440, 23 L. R. A. 155; Green v. Long, 152 Miss. 117, 118 So. 705; 36 C. J. p. 645, section 660; and other authorities.

These authorities do hold that there is no implied covenant on the part of the lessor to keep the leased premises in repair; but they do not hold that it is the duty of the lessee to make radical structural changes in the leased premises in order to make them fit for the purpose for which they were leased. That question will be considered later on in this dissent.

The trouble with the controlling opinion is that it applies principles which have no application to the facts of this case. There is here involved a much larger question than the mere private rights and obligations existing between the ordinary lessor and lessee. There is involved the rights of the public, which are controlling. The private rights and obligations of the parties must stand aside for the benefit of the public welfare. Our statute providing the manner in which buildings for public amusement shall be constructed and maintained declares the public policy of the state on the subject. It is also a criminal statute. Any contract that promotes the violation of the statute is therefore void as against the public policy of the state. Such contracts are not

voidable, but absolutely void and unenforceable, regardless of the intention of the parties. Neither party to the contract can stand on it. Good faith has nothing to do with the question. The court will not enforce such a contract. It will leave the parties where it finds them, regardless of the fact that one of the parties may have an unconscionable advantage of the other; provided both of the parties to the contract knew the *facts* when the contract was entered into. Ignorance of the law is wholly immaterial. Brien v. William, 7 How. 14; Wooten v. Miller, 7 Smedes & M. 380; Odineal v. Barry, 24 Miss. 9; Hoover v. Pierce, 26 Miss. 627; Deans v. McLendon, 30 Miss. 343; Bank v. Stegall, 41 Miss. 142; Barker v. Justice, 41 Miss. 240; Mitchell v. Campbell, 111 Miss. 806, 72 So. 231; American Mfg. Co. v. Crescent Drug Co., 113 Miss. 130, 73 So. 883, L. R. A. 1917D, 482 note; Lowenburg v. Klein, 125 Miss. 284, 87 So. 653.

It was held in American Mfg. Co. v. Crescent Drug Co., supra, that, in declining to enforce an illegal contract, the courts are not influenced by the wishes of the parties thereto, but are governed exclusively by reasons of public policy; that therefore the admission of a defendant in an action on such a contract that the contract is legal can have no effect on the result.

It is true, of course, as contended by appellees, that the theatrical business, within itself, is legal. But it does not follow that such business conducted in a building which does not conform to the statute is legal. On the contrary, the illegal building characterizes the business carried on therein. If the building does not conform to the statute, the whole thing is illegal—the building and the business. They cannot be separated. The contract bound appellants to carry on the theatrical business alone in the Grand Opera House. Appellants had no right, under the terms of the contract, without the written consent of appellees, to conduct any other business therein.

Courts will not be industrious to sustain contracts when the effect will be to weaken the force of laws and regulations designed for the protection of human life. Where a contract, whether so intended by the parties or not, offends against a statute intended to promote the public safety, the court will not enforce it. This principle applies with especial force to contracts for the lease of buildings where the public gather for amusement or other purposes. Leuthold v. Stickney, 116 Minn. 299, 133 N. W. 856, 39 L. R. A. (N. S.) 233, Ann. Cas. 1913B, 405; Medoff v. Fisher, 257 Pa. 126, 101 A. 471; Hart v. City Theatres Co., 215 N. Y. 322, 109 N. E. 497; Bebb v. Jordan, 111 Wash. 73, 189 P. 553, 9 A. L. R. 1035; Nave v. McGrane, 19 Idaho, 111, 113 P. 82; Progress Amusement Co. v. Baker, 106 Wash. 64, 179 P. 81, 82; Manvell v. Weaver, 53 Wash. 408, 102 P. 36; Gerner v. Church, 43 Neb. 690, 62 N. W. 51; R. R. Stores v. Fabyan & Co., 120 Misc. Rep. 142, 197 N. Y. S. 815; Howell v. City of Hamburg, 165 Cal. 172, 131 P. 130; Heineck v. Grosse, 99 Ill. App. 441; Romano v. Bruck, 25 Misc. Rep. 406, 54 N. Y. S. 935; Getty v. Fitch, Cornell & Co., 107 Misc. Rep. 404, 177 N. Y. S. 691, 693; Zeibig v. Pfeiffer Chemical Co., 150 Mo. App. 482, 131 S. W. 131, 132.

Under the law, was the duty on appellants to make the necessary structural changes in the Grand Opera House in order to conform to the statute? The lease contract involved is silent on the subject of repairs, except that it provides that appellees should keep the roof to the building in repair, and that appellants should keep the leased premises in as good repair as when leased, during the term of the lease, and return the leased property at the expiration of the lease to the lessors "in like good order and condition, wear and tear excepted."

A covenant to keep leased premises in repair means that the premises are to be restored to a sound and good state after decay, injury, delapidation or partial de-

struction, not to change either the form or the material of the demised building. Such a covenant binds the lessee to make only ordinary repairs; it does not require him to make repairs necessitating radical changes in the structure of a permanent, substantial, and unusual nature. 36 C. J., p. 139, section 778, and authorities cited in the notes.

The lease contract requires that at the expiration of the lease appellants return the Grand Opera House in the same condition it was when they received it, natural deterioration excepted. Was it possible, under the evidence, for appellants to comply with that stipulation in the lease after making radical structural changes necessary in order to comply with the law? In the light of the evidence, to ask that question is to answer it. In the first place, to have done so, appellants would have been required to materially encroach on the property of appellees not leased; and, in the second place, at the end of the term appellants would have returned to appellees, not the building leased—an outlawed building—but a legal building, radically different in many respects from what it was when it was leased.

The case of Zeibig v. Pfeiffer Chemical Co., supra, decided by the Court of Appeals of Missouri, is illuminating in this connection:

"Our statute—Laws Mo. 1901, p. 219, as amended (see Laws Mo. 1903, p. 251 [Ann. St. 1906, sections 9053—1])—declares: 'It shall be the duty of the owner, proprietor, lessee or keeper of every . . . building . . . which is used as a business place, . . . which has a height of three or more stories to provide said structure with fire escapes attached to the exterior of said building,' etc. It thus appears that, in so far as the general public is concerned, the law lays an obligation against both the owner and lessee to construct fire escapes. Johnson v. Snow, 201 Mo. 450, 100 S. W. 5;

Yall v. Snow, 201 Mo. 511, 100 S. W. 1, 10 L. R. A. (N. S.) 177, 119 Am. St. Rep. 781 [9 Ann. Cas. 1161]; Coutant v. Snow, 201 Mo. 527, 100 S. W. 5. But as between the owner and the lessee, aside from any contract, the obligation of the law is not identical with that which obtains with reference to the public, for in such circumstances the duty of constructing the fire escape rests primarily upon the owner of the property. The question had been pointedly decided by the Supreme Court in Yall v. Snow, 201 Mo. 511, 524, 525, 100 S. W. 1, 10 L. R. A. (N. S.) 177, 119 Am. St. Rep. 781 [9 Ann. Cas. 1161]. It is true as a general proposition, that by the common law the burden of repairs on the demised premises rests upon the tenant, and, unless he covenants to do so, the landlord is not required to construct appurtenances, nor restore the premises after having placed them in the possession of the lessee. 1 Taylor on Landlord and Tenant (9 Ed.), sections 327, 328; Ward v. Fagian, 101 Mo. 669, 14 S. W. 738, 10 L. R. A. 147, 20 Am. St. Rep. 650; Herdt v. Koenig, 137 Mo. App. 589, 594, 119 S. W. 56.

"But to this general rule there is a well-established exception which obtains with respect to the construction of such permanent improvements or fixtures as fire escapes where the duty is enjoined by a positive statute as here. The doctrine which obtains as to this matter is thus stated in 1 McAdam on Landlord and Tenant (3 Ed.) 440: "To the general rule that the landlord is under no obligation to repair except by force of an express covenant there is one exception. If a statute makes it the duty of a landlord to repair in any particular, such repairs must be made by him, in the absence of an agreement by the tenant to make them. Thus, where a city charter imposes upon the owner of tenement houses the duty of keeping fire escapes attached thereto in such repair . . . that they will be suitable for the purpose designed. It is not within the range of ordinary repairs

which a tenant, in the absence of an agreement to the contrary, is required to make. McAlpin v. Powell, 70 N. Y. 126, 26 Am. Rep. 555; Willy v. Mulledy, 78 N. Y. 310, 34 Am. Rep. 536.' See, also, 2 Wood on Landlord and Tenant (2 Ed.), section 381, to the same effect. That the doctrine above stated is the law of this state is obvious from the remarks of the court and citation of authorities in Yall v. Snow, 201 Mo. 511, 521, 524, 525, 100 S. W. 1, 10 L. R. A. (N. S.) 177, 119 Am. St. Rep. 781 [9 Ann. Cas. 1161]. It thus appears that as between the plaintiff owner and the defendant lessee, the obligation to construct the fire escape primarily obtains against the owner of the property, and no recovery may be had against the defendant on account thereof unless it covenanted to do so. The mere fact that defendant leased the premises for business purposes with knowledge that the fire escape which the law required had not been constructed will not imply a covenant to the effect that it should assume the burden suggested; for implied covenants in leases are such only as the law raises from the relation of the parties or from the use of certain terms in establishing that relation. 1 Taylor on Landlord and Tenant (9 Ed.), section 252; 1 McAdam on Landlord and Tenant (3 Ed.), pp. 362, 363, sections 113, 114."

The majority opinion holds that the ordinance of the city of Meridian requiring fire escapes on a building of the character of the Grand Opera House was not properly proved, but that, if it had been, it would not defeat appellees' right to recover; in other words, the court holds that appellants were obligated to provide the fire escapes, and not appellees.

A fire escape has a well-known significance; it is a means of egress from each floor of a building directly to the ground on the outside, not through any other building or buildings. In the first place, under the evidence, in this case it is apparent at once that fire escapes could

not be constructed, leading from each of the three floors of the Grand Opera House, down on Fifth street, without going through property not leased; and, in the second place, the erection of such fire escape would require structural and radical changes in the property not leased. The evidence leaves it uncertain whether fire escapes could be constructed at the rear of the Grand Opera House. Probably the majority opinion is right in holding that the ordinance is not properly proved. The majority opinion contains this language: "If an illegal condition be annexed to a contract, it will not void the whole contract, but the illegal part will be treated as void"—citing Adams v. Standard Oil Co., 97 Miss. 879, 53 So. 692.

What bearing that principle has on the facts of this case is not clear from the opinion. If it is in response to appellees' argument that the stipulation in the lease contract, limiting, the use of the Grand Opera House to theatrical purposes alone, is illegal, that provision is separable from the balance of the contract, which is legal, and the legal part is sufficient to justify the judgment appealed from; the trouble about that position is, there is no way of separating that provision from the balance of the contract. The parties themselves did not separate it. The lease contract was evidenced by three written instruments and, in addition, the notes provided for therein. Two of the papers embodying the contract were dated July 12, 1923; the other was dated July 17, 1923, five days after the date of the other two. The latter paper is the one that limits the use of the building to theatrical purposes. It recites exactly the same considerations moving between the parties as the other two papers do. The second, third, and fourth paragraphs are in this language:

"Whereas said parties entered into a contract of lease dated July 12th, 1923, by which the lessors leased to the

lessees the premises known as the Grand Opera House and the Star Theatre, in Meridian, Mississippi, for a term of twenty-five years, beginning September 1st, 1923, and

"Whereas, there was *omitted* from said agreement the provisions hereinafter contained, which the parties desire now to include in said agreement as part thereof;

"Now, therefore, *for the considerations set forth in the agreement of lease,* the parties hereto do hereby declare, acknowledge and agree that the following provisions shall be held and deemed *to be part of said agreement of lease.*" (Italics ours.)

Then follows, besides another, the limiting stipulation. It seems plain that it took the three instruments to embody the whole contract. The paper dated July 17th simply so stated. It stated that the limiting provision was a part of the original contract, but was omitted for some reason, probably oversight. One of appellees, Levi Rothenberg, on cross-examination, admitted that all three instruments were one contract, based on one consideration, and that the limiting provision, and another unnecessary to mention, had been unintentionally left out of the original contract. So we have, not two contracts, but one inseparable contract; the promises on one side being in consideration of the promises on the other side. Therefore, if the limiting provision is illegal, the whole contract is illegal.

And, furthermore, as hereinbefore stated, shortly before this suit was brought, appellees demanded that appellants go on with their theatrical business in the building, in its then condition, contending that the building conformed to the law. This is shown without conflict in the evidence. Levi Rothenberg, as a witness in the case, admitted as much. In other words, in carrying out the lease contract, all of the parties treated the three instruments as constituting one inseparable contract. Appellees never said to appellants that, if it was illegal to carry on

the theatrical business in the building, they were at liberty to use it for some other purpose. On the contrary, the appellees demanded to the last that appellants continue the theatrical business in the building. In other words, appellees all the time stood squarely on the provision in the contract limiting the use of the building to theatrical purposes. It is therefore too late for this court to undertake to divide the contract up into parts, and separate the legal from the illegal. The court will not do for appellees what they refused to do for themselves.

If appellants were not entitled to a directed verdict in this case, surely they were entitled to have the questions submitted to a jury.

**Griffith, J.,** joins in this dissent.